STATE OF NORTH CAROLINA v. JOSEPH DAVID ANNADALE

No. 351A90

(Filed 14 August 1991)

1. **Homicide § 30 (NCI3d)— first degree murder—refusal to instruct on second degree murder—no error**

The trial court did not err in a murder prosecution by refusing defendant's request to instruct the jury on second degree murder. A defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the State's evidence but not all of it.

**Am Jur 2d, Homicide § 530.**

STATE v. ANNADALE

[329 N.C. 557 (1991)]

2. **Homicide § 21.5 (NCI4th)— murder—motions to dismiss—corpus delicti rule—evidence sufficient**

The trial court did not err by denying defendant's motions to dismiss in a murder prosecution where the opinion of the medical examiner, together with the testimony of other witnesses, clearly establishes a death by criminal agency and meets the requirements of the *corpus delicti* rule.

**Am Jur 2d, Homicide §§ 432, 433.**

3. **Criminal Law § 66.17 (NCI3d); Witnesses § 7 (NCI3d)—murder—in-court identification by victim's son—not tainted**

The trial court did not err in a first degree murder prosecution by allowing the in-court identification of defendant by the victim's son where defendant contended that the in-court identification was tainted by the unnecessarily suggestive statements of a therapist who hypnotized the witness and law enforcement officers who always referred to the picture of defendant as "Joe." The trial judge's findings, supported by competent evidence, clearly show that the witness knew defendant before he was subjected to hypnosis and that the identification was reliable. Assuming that it was error to relate in sequence the events surrounding the disappearance of the victim, defendant was not prejudiced because there was no reasonable possibility that a different result would have been reached at trial had the alleged error not been committed.

**Am Jur 2d, Evidence §§ 831, 1143.**

4. **Criminal Law § 35 (NCI3d)— murder—rumor concerning victim's disappearance—not admissible**

The trial court did not err in a murder prosecution by refusing to allow defendant to question a witness about a man who had come to the witness's store and told him that the victim had been involved with drug dealers, that there was a contract out on her, and that he knew where she was and could get her back for a reward. The proffered evidence consisted of the testimony of a witness concerning statements by an unidentified person, the evidence constitutes hearsay not within any exception, the evidence does not implicate any particular person as the perpetrator, and it is not inconsistent with defendant's guilt.

**Am Jur 2d, Homicide § 329.**

5. **Criminal Law § 51.1 (NCI3d) — murder — testimony of medical examiner — admissible**

The testimony of the medical examiner as to the cause of death was admissible in a murder prosecution despite defendant's contention that the medical examiner was in no better position than the jury to render an opinion. The witness serves as the state's Chief Medical Examiner; he was accepted as an expert in forensic pathology and was allowed to testify as an expert; he was well qualified as a forensic pathologist to provide testimony which was within his area of expertise and helpful to the jurors; and he was subject to thorough cross-examination by defendant concerning his testimony and any apparent discrepancies therein.

**Am Jur 2d, Homicide § 398.**

6. **Criminal Law § 35 (NCI3d) — murder — testimony that offense committed by another — not admissible**

The trial court did not err in a murder prosecution by refusing to permit an assistant district attorney to testify regarding the details of a crime for which a State's witness had been convicted where the evidence was offered to show that the witness rather than defendant committed the crimes for which defendant was being tried. There was nothing so unique about the crimes committed by the witness that one would conclude that the same person must have committed the crimes for which defendant was being prosecuted, and the evidence did not tend to show that a specific person other than defendant committed the crimes in question.

**Am Jur 2d, Homicide § 296.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Albright, J.*, at the 11 September 1989 Criminal Session of Superior Court, ORANGE County, upon a jury verdict of guilty of first degree murder. Heard in the Supreme Court 13 February 1991.

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*J. Kirk Osborn and W. David Lloyd for defendant.*

STATE v. ANNADALE

[329 N.C. 557 (1991)]

FRYE, Justice.

Defendant was indicted on 6 February 1989 for the murder of Mary Kathryn Ennis and was indicted on 7 August 1989 for first-degree kidnapping of Ms. Ennis. The case was tried capitally. The jury found defendant guilty of first-degree kidnapping and first-degree murder on the basis of felony murder and premeditation and deliberation. A separate sentencing proceeding was held pursuant to N.C.G.S. § 15A-2000 (1988). Following a jury verdict recommending a sentence of life imprisonment for the murder, Judge Albright arrested judgment in the first-degree kidnapping case and imposed a life sentence to run at the expiration of the sentence defendant was presently serving. Defendant appealed to this Court, presenting six questions for our review. We find no reversible error.

The evidence presented at trial tended to show that at approximately 6:45 a.m. on 5 November 1986, Mary Ennis' son, Andy Evans, who was five years old at the time, awakened and discovered that he was at home alone. Andy became frightened and called his grandfather. Mr. Ennis, Andy's grandfather, proceeded immediately to Ms. Ennis' mobile home. After arriving at his daughter's home, Mr. Ennis and Andy then drove to the Ice Cream Churn to see David Smudski, Ms. Ennis' boyfriend. Smudski told Mr. Ennis that he had not seen Ms. Ennis; so Mr. Ennis left and took Andy to school.

Smudski left to go to Ms. Ennis' mobile home shortly after Mr. Ennis left his store. On the way he noticed Ms. Ennis' car on the side of Lawrence Road. He went to Ms. Ennis' trailer and telephoned the sheriff. Smudski then returned to Ms. Ennis' car, met the sheriff's deputy, and informed him of the situation.

Winona Harris and her husband lived across the road from Ms. Ennis' trailer. In October of 1986, defendant moved in with Mr. and Mrs. Harris. Every morning when Mrs. Harris arose she could see Ms. Ennis' porch light shining through her kitchen window. According to Mrs. Harris, Ms. Ennis' porch light and bathroom light burned twenty-four hours a day. However, on the morning of 5 November 1986, Mrs. Harris noticed that there were no lights on in Ms. Ennis' trailer. Mrs. Harris testified that she got out of bed around 3:30 a.m. on 5 November to awaken her husband and to get things ready for him to leave for work. She further testified that just as she turned a light on inside her trailer, defend-

ant entered stating that he had just run a Mexican man out of the back yard. Defendant told Mrs. Harris that he had spent the night outside so that he would not awaken Mr. Harris by entering the trailer so late.

Deputy Bobby Collins first interviewed defendant concerning Ms. Ennis' disappearance on or about 7 November 1986. During the interview, defendant told Deputy Collins that on 4 November 1986, he left work around 5:00 p.m., went to the Hillsborough Prison Unit to check on his work release checks, and then returned to the Harris' trailer. Defendant also told Deputy Collins that later in the evening he drove to Mebane or Burlington looking for a friend, then returned to Hillsborough and drove around town. According to defendant, during the time he was gone he was drinking beer and taking valium. Defendant stated that when he returned to the trailer it was late and he did not want to awaken Mr. Harris so he slept in his car until he was awakened by rain hitting the car. Defendant also told Deputy Collins that when he awakened he saw a Mexican man standing at the rear of the Harris' residence so he got out of the car and chased the man, but was unable to catch him. Defendant went inside after Mrs. Harris turned lights on inside the trailer. Deputy Collins contacted defendant on several other occasions to ask questions concerning Ms. Ennis' disappearance.

In March 1987, defendant began living with Shelby Riddle. On 27 June 1987, Riddle went to the Orange County Sheriff's Department and reported that defendant had assaulted her with a gun and threatened to kill her. Riddle would not take out a warrant against defendant, but the Sheriff's Department took out a felonious assault warrant against defendant based upon the information obtained from Riddle.

While at the Sheriff's Department, Riddle told the sheriff that defendant told her while they were doing an "eight-ball" of cocaine that he killed Ms. Ennis. Riddle also told the sheriff that defendant stated that he chopped up Ms. Ennis' body with a shovel, put her in a plastic bag and buried her. Riddle then told the sheriff that a week after defendant confessed to her, he borrowed her car to move Ms. Ennis' body because he was afraid she was going to be dug up.

Lynn Stevens, a friend of Riddle, testified that Riddle told her that defendant would awaken at night because he would dream of Ms. Ennis. Stevens testified that after defendant attacked Riddle,

Riddle changed the story to say defendant actually sat down and told her the story. Stevens further testified that Riddle told her to tell the police that on the evening of 4 November 1986, Stevens saw two people standing by Ms. Ennis' car on the side of Lawrence Road. Stevens told the police that the woman had dark short hair and the man had long dark hair. Subsequently, Stevens told defense counsel the same story in Riddle's presence, but when she was alone with counsel, she told him that she had lied. Stevens admitted that on the evening in question, she observed Ms. Ennis' car only. Stevens testified that while Riddle was living with defendant, she was having a relationship with another man, and Riddle spoke frequently of the reward money offered in this case. Stevens also stated during the trial that Riddle had threatened her about her testimony. On cross-examination Stevens admitted that she had not related this story to the sheriff's deputies, even when she spoke to them out of Riddle's presence.

On 10 July 1987, defendant was arrested on charges taken out by the Orange County Sheriff's Department concerning his alleged assault on Riddle. On 20 July 1987, Robert Webster, who was jailed in a cell adjoining defendant's, sent a message to the jailer that he wanted to speak with Major Truelove, an officer with the Orange County Sheriff's Department. Webster reported to Truelove that either defendant had done something awfully wrong or he was seriously disturbed, and defendant could not sleep at night because he had nightmares and was mad at Truelove. Webster also informed Truelove that defendant said he might as well go ahead and admit that he killed the girl so that Truelove would leave him alone.

On 31 July 1987, Orange County Sheriff's deputies showed Andy Evans a photographic line-up that consisted of six pictures, one of which was a picture of defendant. Andy selected a picture of defendant out of the photographic array as a person he recognized. The deputies called Andy's therapist, Dr. Barbara Hawk, and scheduled a meeting with her for another photographic identification procedure. Dr. Hawk had been working with Andy in an attempt to help him work out his emotions regarding the loss of his mother. Dr. Hawk was also working with the Orange County Sheriff's Department in an attempt to get information from Andy concerning the disappearance of his mother. During the next photographic line-up, referring to the picture of defendant, Andy stated that defendant had come over to his trailer the night of

4 November 1986. Andy told Dr. Hawk that his mother had an argument with the man in the picture because the man did not want Ms. Ennis to date other men. Andy thought that the defendant's name was Mike or Steve.

On 1 February 1988, Dr. Hawk, the Orange County Sheriff's deputies and Andy viewed a video taped line-up containing six men, one of whom was defendant. The tape was viewed twice. Portions of the video tape had the six men reading from a transcript. Defendant was number three in the line-up. Andy was asked if number three was the man who was in his trailer and he responded, "that looks like the man; I think his name is Mike; you said his name is Joe."

Prior to the trial, a voir dire hearing was held on the permissibility of Andy making an in-court identification of defendant. During voir dire, Andy stated that the name Joe Annadale was first mentioned to him by either Lt. Collins or Major Truelove before the photographic line-up procedure. Also, during voir dire, it was determined that on 17 August 1987, Andy was shown ten or eleven individual photographs, and he was asked to separate the pictures into three piles: persons he knew, persons he maybe knew, and persons he did not know. Andy first put the picture of defendant in the "knew" pile, but later put it in the "maybe knew" pile. Additionally, during the video line-up on 1 February 1988, Andy identified one other person in the line-up, a Durham police officer, as a person who had been to his mother's trailer in a white truck.

Testimony at the voir dire hearing revealed that on 4 March 1988, Andy was put into a hypnotic trance by Dr. Shirley Sanders, a nationally recognized expert in hypnosis, in an effort to bypass emotional blocks that interfere with retrieval of memory in order to gain more information from Andy about the disappearance of his mother. According to Dr. Hawk, this session was the first time Andy had used the name Joe in his identification of the man who argued with his mother on 4 November 1986, and this was the first time Andy could relate the events surrounding his mother's disappearance in sequence.

The trial judge denied defendant's Motion to Suppress Andy's in-court identification of defendant as being the man he saw in his trailer the night of 4 November 1986. Over the objection of defendant, Andy was permitted to make the in-court identification

of defendant. Andy also testified that on 4 November 1986, he and his mother drove over to Smudski's house and left a note on the door for Smudski about him dating other women. Andy testified that he could tell that his mother was angry by the way she acted, and on that evening his mother told him that if she was not home in the morning when he woke up, she would be at Smudski's house.

On 25 May 1988, Wendell Strickland, the State's chief witness, was sentenced to fifty years in prison for second-degree kidnapping, second-degree rape, second-degree sexual offense, common law robbery, and assault upon a female. Defendant's counsel, during cross-examination, attempted to elicit from Strickland details of these crimes, and Strickland invoked his Fifth Amendment privilege against self-incrimination. Defense counsel then attempted to make an offer of proof through the testimony of Tom Murphy, the assistant district attorney who prosecuted Strickland. This offer of proof was denied.

Strickland met defendant sometime after 7 July 1988, when defendant entered Central Prison. According to Strickland, defendant told him that he was hired to "off" Ms. Ennis for $5,200. Strickland testified that Ms. Ennis' boyfriend, a cocaine supplier from Florida, gave defendant a key to Ms. Ennis' trailer. Strickland further testified that defendant said that he entered the trailer, went to Ms. Ennis' bedroom, and put a washcloth over her mouth. He allowed her to look in on her son, then he left the trailer with Ms. Ennis and she drove him in her car to a remote area. Defendant told Ms. Ennis that he was not going to kill her; they exited the car, and defendant took Ms. Ennis into the woods. Defendant tried to choke her to death, but being unable to do so, he cut her throat. Strickland also testified that defendant drew a map on a concrete podium on the prison basketball court of the location of Ms. Ennis' body, and after defendant erased the map by scratching it out, Strickland went to Bible class and reproduced the map in a composition book.

Carmello Mangione, also an inmate at Central Prison, testified that on or about 8 August 1988, he and Strickland obtained some artane and marijuana, and during that evening defendant used the drugs with them. Mangione provided basically the same information as Strickland concerning defendant's confession. However, according to Mangione, after defendant told his story, he left the cell block for a while and returned to find defendant drawing a

map for Strickland. Mangione testified that after defendant drew the map, Strickland folded it and placed it on the bed, but defendant later threw it on the floor. Mangione further testified that when the three of them got ready to leave, Strickland picked up the map, smoothed it out, and kept it. Mangione testified that both he and Strickland went to Tracy Porter, a prison official, and told him about the information regarding the missing woman.

On 13 September 1988, Strickland met with Truelove and District Attorney Carl Fox to discuss what defendant allegedly told him. During the meeting, Strickland would only say that he had information as to the exact location of Ms. Ennis' body. Strickland would not tell Truelove and Fox anything until he was assured that he would be released from prison and that he would get the reward money.

On 31 October 1988, Wayne Eads, Strickland's attorney, wrote to Fox regarding negotiating an agreement for Strickland in exchange for Strickland's testimony concerning the disappearance of Ms. Ennis. In his letter, Eads represented that Strickland's testimony concerning this case "was received by him directly from the perpetrator prior to his [Strickland's] arrest, conviction and imprisonment and did not arise in any way from a jailhouse or prison conversation or gossip."

On 9 January 1989, using a map provided by Strickland, Orange County law enforcement officers and SBI agents began searching for Ms. Ennis' body, and when they found human remains in the area, they immediately called in Dr. John Butts of the State's Medical Examiner's Office to make an inspection and collect various remains in the area. While at the scene, Dr. Butts found a human skull, a small cluster of bones consisting of vertebrae, backbones and rib bones, a portion of the sacrum, and hip bones. Dr. Butts collected the bones, carried them to Chapel Hill, cleaned them and examined them for evidence of injury, abnormality, or changes. Dr. Butts detected considerable animal damage to the hip bones and located no jawbone, collarbone or shoulder blades.

Dr. Butts testified that in his opinion, the bones belonged to a relatively young white female. Dr. Butts consulted with the Orange County Sheriff's Department concerning possible identities, then he obtained medical records, including x-rays and dental records of Ms. Ennis. Assisted by Dr. William Webster, a forensic odontologist, Dr. Butts compared postmortem x-rays of the teeth and

skull with antemortem x-rays known to be from Ms. Ennis. The doctors compared dental records of Ms. Ennis' known fillings or restorations with those fillings and restorations visible in the remaining teeth. Dr. Butts found numerous points of identity and similarity, which included tooth restorations as well as skull bone patterns. According to Dr. Butts, x-rays of bone contain characteristics that are unique for that particular person, and one can determine the identity of a skull or other bone by comparing an x-ray of that material with x-rays taken of a living person. Dr. Butts testified that in this case, the pattern of the sella turcica, a little spot in the middle of the skull which contains the pituitary gland, matched, as did the skeletal pattern in an area containing some of the sinuses. In Dr. Butts' opinion, the remains he collected in the Orange County field were those of Ms. Ennis.

Defendant offered expert testimony through Dr. Thomas David, a forensic odontologist. Dr. David testified that the American Board of Forensic Odontologists has essentially three categories of identification with one special category: positive identification, possible identification, exclusion, and a special category when there is not enough evidence to render any opinion one way or the other. Dr. David reviewed the same antemortem and postmortem x-rays and overlays used by Dr. Butts and Dr. Webster. Dr. David testified that Dr. Webster apparently knew beforehand that he was attempting to identify the remains as those of Ms. Ennis, and therefore his identification was not done blindly with no knowledge of whom he was attempting to identify. Dr. David testified that the postmortem x-rays prepared by Dr. Webster were of insufficient quality to tell the exact configuration of the restorations. Dr. David also testified that better quality x-rays and additional types of x-rays could have been prepared which would have made the identification process indisputable. According to Dr. David, the identification fell into the category of possible identification, meaning that there are consistent features between the antemortem evidence and the postmortem evidence but the amount and/or quality of evidence is insufficient to establish a positive identification.

Defendant did not testify before the jury.

[1] The first question we address is whether the trial court erred in refusing defendant's request to instruct the jury on second-degree murder. Defendant contends that if he did in fact kill Ms. Ennis, but acted without premeditation or without deliberation,

STATE v. ANNADALE

[329 N.C. 557 (1991)]

and did not commit the murder during the perpetration of the felony of kidnapping, he would be guilty of second-degree murder. Defendant further contends that "[t]he sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981). According to defendant, there was evidence from which a reasonable juror could conclude that Ms. Ennis left her home voluntarily and went to Smudski's home in an effort to settle a lovers' quarrel. Defendant further argues that a reasonable juror could conclude from the testimony that defendant had been drinking and taking valium and that he could not have formed the intent to premeditate or deliberate, each being necessary elements of first-degree murder. Finally, defendant contends that all of the State's evidence relating to proof of intent, malice, premeditation, deliberation, and specific intent to kill was either circumstantial or presented through the testimony of interested witnesses, such as Mangione and Strickland.

The State contends that the trial judge properly charged the jury concerning first-degree murder alone, based upon premeditation and deliberation as well as upon the theory of felony murder. The State contends that the evidence does not support a second-degree murder instruction.

Although second-degree murder is a lesser included offense of premeditated and deliberate first-degree murder, a trial court does not have to submit a verdict of second-degree murder to the jury unless it is supported by the evidence. *State v. Stevenson*, 327 N.C. 259, 263, 393 S.E.2d 527, 529 (1990). This Court in *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), *overruled on other grounds*, *State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986), held:

> We emphasize again that although it is for the jury to determine, from the evidence, whether a killing was done with premeditation and deliberation, the mere possibility of a negative finding does not, in every case, assume that defendant could be guilty of a lesser offense. Where the evidence belies anything other than a premeditated and deliberate killing, a jury's failure to find all the elements to support a verdict of guilty of first degree murder must inevitably lead to the conclusion that

the jury disbelieved the State's evidence and that defendant is not guilty. The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. at 293, 298 S.E.2d at 657-58.

In this case, the testimony of Mangione and Strickland supports only a first-degree murder instruction. Both Mangione and Strickland testified that defendant told them that he kidnapped Ms. Ennis and ultimately killed her by choking her first and then cutting her throat. Police officers located the remains of Ms. Ennis' body utilizing a map reproduced by Strickland after it was initially drawn for him by defendant. There was no evidence that the homicide was committed without premeditation and deliberation. Defendant's argument seems to be based on the theory that the jurors may accept a portion of the State's evidence, yet reject other portions of its evidence, thus the State would fail to prove each element of first-degree murder. A defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the State's evidence but not all of it. *State v. Brewer*, 325 N.C. 550, 576, 386 S.E.2d 569, 584 (1989), *cert. denied*, --- U.S. ---, 109 L. Ed. 2d 541 (1990). The evidence in this case belies anything other than a premeditated and deliberate murder. Thus, the trial judge properly refused to instruct on second-degree murder.

[2] In defendant's second argument, he contends that the trial court erred in denying his motions to dismiss made at the close of the State's evidence and again at the close of all the evidence. Defendant contends that under the *corpus delicti* rule, a conviction cannot be sustained on a naked, extrajudicial confession which shows that a crime was committed by someone though not necessarily by the defendant. *State v. Green*, 295 N.C. 244, 244 S.E.2d 742 (1978). Defendant further contends that North Carolina law is settled that for the purpose of analyzing the rule of *corpus delicti*, confessions and admissions are considered synonymous. *State v. Franklin*, 327 N.C. 162, 393 S.E.2d 781 (1990). Therefore, according

to defendant, his statements made to Collins, Riddle, Webster, Mangione and Strickland and offered against him at trial must be considered under the *corpus delicti* rule.

"Our long-established rule of *corpus delicti* stands for the proposition that if there is corroborative evidence, independent of the incriminating statements, defendant may be found guilty of the crime charged." *Id*. at 173, 393 S.E.2d at 788. The evidence presented by the State complies with the requirements of the *corpus delicti* rule. The State offered the testimony of three persons who were in jail with defendant as well as the testimony of the State's Chief Medical Examiner, Dr. Butts. Dr. Butts explained to the jury his field observations and laboratory examinations of the human remains found in the field near Hillsborough, North Carolina. Dr. Butts identified the skull as that of Ms. Ennis and expressed the opinion that Ms. Ennis died as the result of violence or injury trauma, an external cause, rather than from natural disease. On cross-examination, Dr. Butts stated that the information provided to the Sheriff's Department by the informant appeared consistent with the results of his examination and nothing appeared inconsistent with his findings. Dr. Butts also testified that in his opinion, the evidence was not consistent with suicide because of "[t]he location that the remains were found; the circumstances under which the individual disappeared; the age of the individual; the absence of, for instance, any clothing, jewelry, other things associated with remains. All of these indicated to me that her death came at the hands of some other individual."

Dr. Butts' testimony establishes the *corpus delicti*. "Evidence of corpus delicti coupled with the testimony of a cell mate relating inculpatory statements made by the defendant is sufficient to support a conviction." *State v. Franklin*, 327 N.C. at 174, 393 S.E.2d at 788 (citing *State v. King*, 326 N.C. 662, 675, 392 S.E.2d 609, 617 (1990) ). Thus, we conclude that Dr. Butts' opinion testimony, together with the testimony of other witnesses, clearly establishes a death by criminal agency and meets the requirements of the *corpus delicti* rule. Therefore, this assignment of error is rejected.

[3] Next, defendant contends that the trial court erred by allowing the in-court identification of defendant by the victim's son, Andy, because the in-court identification was tainted by the unnecessarily suggestive statements of his therapist and law enforcement officers who always referred to the picture of defendant as "Joe." Defend-

STATE v. ANNADALE

[329 N.C. 557 (1991)]

ant notes that through hypnosis, Andy, for the first time, used the name "Joe" to identify defendant's picture that he had previously referred to as "Steve" or "Mike," and Andy was also for the first time able to put all the events surrounding his mother's disappearance in sequence. According to defendant, under the guidelines of *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984), he is entitled to a new trial.

Hypnotically refreshed testimony is inadmissible in judicial proceedings. *State v. Peoples*, 311 N.C. at 533, 319 S.E.2d at 187. Nevertheless, in *Peoples* this Court stated, "[o]ur rule of inadmissibility does not, however, render all testimony of a previously hypnotized witness inadmissible. A person who has been hypnotized may testify as to facts which he related before the hypnotic session." *Id.* at 533, 319 S.E.2d at 188.

In this case, an investigator met with Andy on 31 July 1987, and Andy viewed a photographic line-up and identified the defendant's picture as the person who argued with his mother on the evening she disappeared. The investigator asked Andy the color of the person's eyes that he had identified, and Andy replied that the man has green eyes. Defendant has green eyes. The photographs viewed by Andy were all black and white photographs of white males approximately the same age, with similar hairstyles and facial hair. The investigator never told Andy the names of any of the persons in the photographs. Also, on 31 July 1987, Andy viewed the same photographic lineup in the presence of his therapist, Dr. Hawk. Again, Andy identified defendant's photograph and stated that he was the man that his mother argued with concerning her dating other men. Andy underwent hypnosis in March 1988. Thus, his identification of defendant occurred prior to the hypnotic session.

Prior to admitting the in-court identification of defendant by Andy, the trial court conducted a voir dire hearing on defendant's Motion to Suppress such identification testimony. The trial judge made detailed findings of fact, including a finding that the witness' in-court identification was "of independent origin based upon the witness's knowledge of the defendant from having seen him prior to the time of the disappearance of his mother in his yard and in his trailer, and further having seen defendant in the witness's own trailer on the night his mother disappeared during an argument." The trial judge concluded that Andy's in-court identification of defendant "is of independent origin and is not tainted by any

out-of-court photographic procedure which was impermissively suggestive, nor is said identification tainted by any 'hypnotic suggestion.' " The critical issue here is the reliability of the in-court identification of defendant, by whatever name he may be called. The trial judge's findings, supported by competent evidence, clearly show that Andy knew defendant before he was subjected to hypnosis and that the identification was reliable. Thus, the testimony was not inadmissible under *Peoples*.

Assuming, *arguendo*, that it was error to permit Andy to relate in sequence the events surrounding the disappearance of his mother, defendant was not prejudiced thereby. Andy had previously related the same information to Dr. Hawk, although not in sequence. On two occasions prior to hypnosis, Andy identified defendant as the man who argued with his mother the night she disappeared. Moreover, the State presented three witnesses other than Andy who testified concerning defendant's inculpatory statements to them. Thus, the alleged error was not prejudicial since there is no reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial. *State v. Hunt*, 325 N.C. 187, 193, 381 S.E.2d 453, 457 (1989).

[4]  In defendant's next argument, he contends that the trial judge erred in refusing to allow him to question Smudski about what the trial judge called the "Rambo" declarations. The "Rambo" declarations consisted of information allegedly obtained by Smudski from an unknown man that he nicknamed "Rambo."

During a voir dire hearing, the trial judge allowed defendant to make an offer of proof concerning the information "Rambo" allegedly related to Smudski. Smudski told SBI agents that a white male nicknamed "Rambo" came into his store one day and brought up the topic of Ms. Ennis because of a missing persons poster Smudski had posted. Smudski also told the SBI agents that "Rambo" claimed to know where•Ms. Ennis was located and that he would get her back for Smudski in exchange for Smudski getting the reward money for him. According to Smudski, "Rambo" also told him that Ms. Ennis was involved with some drug dealers and there was a contract out on her. Defendant contends that the evidence appeared relevant and was proffered for the non-hearsay purpose of showing that within three months of Ms. Ennis' disappearance, there was an existing rumor that her boyfriend was a cocaine supplier from Florida; that the boyfriend and Ms. Ennis owed money

STATE v. ANNADALE

[329 N.C. 557 (1991)]

on a cocaine debt; and that there was a contract out on Ms. Ennis due to the debts. Defendant further contends that these facts were unusual and closely paralleled the testimony of Strickland and Mangione. Defendant attempted to present this evidence to bolster his defense that either Strickland himself committed these crimes, or he gained enough information from Smudski or through his other efforts, so that he could lead law enforcement officers to the remains and hence obtain significant rewards in the form of money and freedom. Defendant argues that in a very close case in which there is only circumstantial evidence identifying the defendant, to the exclusion of others, as the perpetrator, proffered evidence tending to implicate another and to be inconsistent with defendant's guilt is admissible. *State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988).

The State objected to allowing this testimony into evidence. The trial judge sustained the State's objection. Evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1986). The State argues that in this case, the proffered evidence possesses no relevancy and the trial judge properly excluded the testimony. We agree.

We do not agree with defendant that *McElrath* is controlling. The facts in the present case are distinguishable from those in *McElrath*. In *McElrath*, this Court held that it was error for the trial judge to refuse to admit a map found among the victim's personal papers showing the area surrounding the defendant's summer home, with notations indicating that the defendant, with others, planned a larceny. *State v. McElrath*, 322 N.C. at 14, 366 S.E.2d at 449. The Court found that the map and notations, together with other evidence offered, could indicate that the victim suffered a falling out with his co-conspirators which resulted in his death at their hands and not at the hands of the defendant. *Id.* at 11-13, 366 S.E.2d at 448-50. In the present case, the proffered evidence consists of the testimony of a witness concerning statements by an unidentified person. The evidence constitutes hearsay not within any hearsay exception. Here, defendant seeks to place before the jury evidence of a mere rumor purportedly circulating in Orange County concerning Ms. Ennis' disappearance. The evidence does not implicate any particular person as the perpetrator of the crime

and is not inconsistent with defendant's guilt. Thus, the trial court did not err in rejecting this testimony.

[5] Next, defendant contends that the trial judge erred in allowing Dr. Butts to give opinion evidence as to the cause of Ms. Ennis' death and other matters. Over defendant's objection, Dr. Butts was permitted to give his opinion: 1) that the bones that were found appeared to be lying on top of the ground, rather than having been buried; 2) that a hole in the skull was the result of some blunt trauma; 3) that it is not uncommon for remains to be carried off by animals; 4) that Ms. Ennis' death was the result of violence or injury trauma, external causes, rather than from natural disease; and 5) as to the length of time a person would live if his or her throat was cut. Defendant contends that Dr. Butts' autopsy report simply stated that the bones he found were consistent with a young to middle age individual; were consistent with a female sex; were consistent with a white racial background; were insufficient to determine stature; and showed no obvious gunshot wounds, knife cuts or other trauma that could be excluded from animal injury. Defendant also contends that Dr. Butts admitted that he listed as the cause of death on the autopsy report an "incision of the throat" which was based upon information he received from the Orange County Sheriff's Department. Thus, defendant contends that under these facts, Dr. Butts was in no better position to render opinions as to each of the five areas than were the individual jurors.

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion. N.C.G.S. § 8C-1, Rule 702 (1988). Dr. Butts serves as the State's Chief Medical Examiner. He was accepted as an expert in forensic pathology and was allowed to testify as an expert witness. As a forensic pathologist, Dr. Butts was well qualified to provide testimony which was within his area of expertise and helpful to the jurors. Dr. Butts was subject to thorough cross-examination by defendant concerning his testimony, and any apparent discrepancies therein. The trial judge did not err in permitting Dr. Butts to give his opinion as to the cause of the victim's death.

[6] In defendant's final argument, he contends that the trial court erred in refusing to permit Tom Murphy, an Assistant District Attorney for Wake County, to testify before the jury regarding

the details of the crimes for which Murphy prosecuted Wendell Strickland in May of 1988. The evidence was offered in an attempt to show that Strickland rather than defendant committed the crimes for which defendant was being tried.

On voir dire, Murphy testified that he prosecuted Strickland for second-degree rape, second-degree sex offense, first-degree kidnapping, common law robbery, and assault on a female in May of 1988. The evidence in that case disclosed that Strickland kidnapped his victim from Crabtree Valley Mall in Raleigh in January 1988, drove her in her car to a rural area in Johnston County where he raped her and committed a sex offense upon her. At the close of the voir dire testimony, Judge Albright determined that the incidents referred to in the testimony were not sufficiently similar to the crimes for which defendant was being tried and were too remote in time to be more probative than prejudicial under N.C.G.S. § 8C-1, Rule 403 (1988). Judge Albright further determined that the probative value, if any, that this testimony might have was substantially outweighed by the danger of unfair prejudice. Judge Albright also expressed his opinion that the present case is factually distinguishable from the circumstances giving rise to this Court's opinion in State v. Cotton, 318 N.C. 663, 351 S.E.2d 257 (1987).

In Cotton, this Court held that the trial court erred in refusing to admit certain evidence of crimes committed by a person other than the defendant. The evidence of the other crimes appeared close in time, place, and circumstance to the charged offense. This Court stated:

> The evidence excluded here showed that within a few hours during the same night, three homes in close proximity were broken into and the female occupants sexually assaulted. The modus operandi in each case was very similar. From this evidence, the jury reasonably could have concluded that the three attacks were committed by the same person. The excluded evidence also tended to show that a specific person other than the defendant committed one of the very similar break-ins and assaults. Further, nothing in evidence tended to show that any of the three break-ins and attacks were committed by more than a single individual. The excluded evidence therefore tended to show that the same person committed all of the similar crimes in the neighborhood in question on

that night and that the person was someone other than
defendant.

*State v. Cotton*, 318 N.C. at 667, 351 S.E.2d at 280.

We agree with Judge Albright that the present case is factual-
ly distinguishable from *Cotton*.

There was nothing so unique about the circumstances sur-
rounding the crimes committed by Strickland that one would con-
clude that the same person must have committed the crimes for
which defendant was being prosecuted. On the contrary, factual
dissimilarities abound. Strickland kidnapped a stranger, and defend-
ant kidnapped an acquaintance. Strickland raped and sexually
assaulted his victim, while defendant murdered his victim.
Strickland's crimes were committed in Wake and Johnston Coun-
ties, and defendant's crimes were committed in Orange County.
Strickland's offenses were committed in January of 1988, and de-
fendant's offenses were committed in November of 1986, some four-
teen months earlier.

Unlike the circumstances in *Cotton*, the evidence in this case
does not tend to show that a specific person other than defendant
committed the crimes in question. Evidence of the guilt of one
other than the defendant is admissible if it points directly to the
guilt of another specific party and tends both to implicate that
other party and be inconsistent with the guilt of the defendant.
*State v. Brewer*, 325 N.C. 550, 386 S.E.2d 569. Nothing in the
proffered evidence points directly to Strickland as the perpetrator
of the offenses for which defendant was being tried; nor is the
evidence inconsistent with the guilt of defendant. The evidence
in the present case creates a mere inference or conjecture regard-
ing guilt of another and therefore was properly excluded. *See State
v. Simpson*, 327 N.C. 178, 393 S.E.2d 771 (1990). Thus, we find
no error or abuse of discretion in the trial judge's decision to
exclude the evidence.

We conclude that defendant has had a fair trial, free of preju-
dicial error.

No error.