IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-43

No. COA19-1006

Filed 2 March 2021

Wilson County, No. 17 CRS 52335-36

STATE OF NORTH CAROLINA

v.

EMUNTA CARPENTER

Appeal by defendant from judgment entered 5 February 2019 by Judge Quentin T. Sumner in Wilson County Superior Court. Heard in the Court of Appeals 10 February 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Jason P. Caccamo, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for the defendant.*

TYSON, Judge.

## I. Background

¶ 1 D.C. and Emunta Carpenter ("Defendant") were involved in a romantic relationship. They are the parents of a child, who was five years old when these events occurred on 17 January 2017. That day, Defendant became angry about contacts he had found on D.C.'s cellphone. While walking to D.C.'s car, Defendant inquired whether D.C. had engaged in intimate relationships while he was an inmate

in prison for a year. She told Defendant she had. Once seated in D.C.'s car, Defendant's anger quickly devolved into abuse and violence.

¶ 2 Defendant punched D.C. twice as she sat in the driver's seat. He berated her about her sexual relationships while he was imprisoned. The physical violence escalated as Defendant repeatedly hit her. D.C. testified Defendant "got so mad he just start (sic) beating on me and telling me I'm going to get flipped . . . and I'm going to have sex with him and his cousin."

¶ 3 D.C. told Defendant she "wasn't going to do it," refusing to participate in sexual acts with both Defendant and his cousin, Tafari Battle ("Battle"). When D.C. told Defendant no, he continued to hit her. D.C. testified Defendant, "told me to take him to his cousin's house . . . when I told him no, he picked up some grip pliers in my car and raised them up at me as if he was going to hit me." D.C. stated Defendant said, "on 8 Trey you going to get flipped." She continued, "[w]hen he said 8 Trey I knew he was serious because that's his gang and when he say that he will do it."

¶ 4 Defendant forced D.C. to drive to Battle's house. Upon arrival, Defendant walked past one cousin, Kwon, and into Battle's home. Shortly thereafter, Defendant and Battle emerged from the house. D.C. attempted to drive away, but Defendant jumped back into the car, leaving Battle behind. D.C. and Defendant drove around for a few moments. D.C. testified, "I asked him like if I do this what is he going to get out of it. He was like it's for [Battle]." D.C. testified that she tried to speed in

hopes of drawing attention from a nearby police station.

D.C. and Defendant pulled her car back into Battle's driveway. While Defendant was out of the car retrieving Battle, D.C. began recording the events on a cellphone she had secreted inside her bra. This recording of the entire crime was admitted into evidence and played for the jury.

As Defendant and Battle approached the car again, both men were laughing and smiling. Battle got into the backseat of the car and D.C. was instructed to drive to Defendant's sister's house while being threatened with the grip pliers. Upon arrival, Defendant instructed Battle to go to the shed behind the house. D.C. testified that she tried slamming the car doors loudly in hopes of garnering attention from a passerby. Defendant threatened to beat D.C. further if she did not move to the shed.

Battle was already in the shed waiting when D.C. entered with Defendant. Defendant demanded D.C. perform oral sex on him while Battle watched in close proximity. Defendant told Battle to get ready to have sex with D.C., because D.C. "can't" perform oral sex on Battle. Battle manipulated himself to get his penis erect. Defendant asked Battle if he was ready, and Battle said yes.

Defendant demanded D.C. bend over so Battle could have sex with her. When she refused, he beat her further with his hands, feet, and the pliers. After beating her, Defendant again forced D.C. to perform oral sex on him.

Battle and Defendant made D.C. stand up and together they forcibly removed

her shorts. As they removed her shorts, she kept objecting and saying no. "I was begging [Battle] not to do it. I was looking at [Battle] crying while [Defendant] kept beating me up." Battle raped D.C. as she was bent over a chair in the shed.

¶ 10        D.C. moved her body so that she could no longer be penetrated by Battle and this action enraged Defendant. He cursed her and started to beat, choke, kick and spit on her. Battle told her she might as well get it over with.

¶ 11        After beating D.C., Defendant demanded, for the third time, she perform oral sex on him. When D.C. did not perform the act in the manner Defendant preferred, he resumed hitting her. Defendant told Battle to "get out right quick" as Defendant continued to hit D.C. After Battle re-entered the shed, Defendant's beating became so violent, D.C. testified she thought she was going to die.

¶ 12        In desperation, D.C. told Defendant if he gave her the pliers, she would let Battle have sex with her. When D.C. received the pliers, she threw them out the window, further enraging Defendant and causing him to throw her around the shed and continue to hit her. Battle watched as D.C. cried out for his assistance. He stood by and watched Defendant's actions.

¶ 13        As Defendant held D.C.'s hair and assaulted her, she tried to escape. D.C. pulled away, leaving a clump of hair in Defendant's hand, and ran to her car. Battle made no attempt to stop her. D.C. drove to her mother's house and went to the police station to report the crimes.

Defendant was indicted on 17 July 2017 for: (1) first-degree kidnapping; (2) first-degree forcible rape; and (3) first-degree forcible sex offense. The trial court dismissed the charge of first-degree forcible rape.

The jury returned verdicts finding Defendant guilty of first-degree kidnapping and first-degree sex offense. Defendant was sentenced to imprisonment for 317-441 months on the charge of first-degree sex offense and to a consecutive term of imprisonment for 96-172 months on the charge of first-degree kidnapping. Defendant gave notice of appeal in open court following entry of the judgments and commitments.

## II. Jurisdiction

This Court possesses jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b) (2019).

## III. Issue

The issue before this Court is whether the trial court should have given a jury instruction for the lesser included offense of second-degree forcible sex offense.

## IV. Standard of Review

Our Supreme Court stated: "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E. 2d 186, 191 (1973).

¶ 19      Applying this standard, our Supreme Court has held, "[a]n instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002). "If the State's evidence is sufficient to fully satisfy its burden of proving each element of the greater offense and there is no evidence to negate those elements other than defendant's denial that he committed the offense, defendant is not entitled to an instruction on the lesser offense." *State v. Smith*, 351 N.C. 251, 267–68, 524 S.E.2d 28, 40 (2000) (citation omitted). If there is "no evidence giving rise to a reasonable inference to dispute the State's contention," the trial court is not obligated to give a lesser included instruction. *State v. McKinnon*, 306 N.C. 288, 301, 293 S.E.2d 118, 127 (1982).

¶ 20      When determining whether the evidence is sufficient for instruction on a lesser included offense, the evidence must be viewed in the light most favorable to the defendant. *State v. Barlowe*, 337 N.C. 371, 378, 446 S.E.2d 352, 357 (1994). It is reversible error for a trial court to fail to submit lesser included offenses to the crime charged that are supported by the evidence. *State v. Lytton*, 319 N.C. 422, 426-27, 355 S.E.2d 485, 487 (1987). Preserved challenges to jury instructions are reviewed *de novo. State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E. 2d 144, 149 (2009).

## V.    Analysis

## A. First-Degree Forcible Sex Offense

¶ 21 Defendant was indicted for first-degree forcible sex offense in violation of N.C. Gen. Stat. § 14-27.26(a)(3) (2019). The elements of this offense are: (1) engaging in a sex act [fellatio] with another person, (2) by force and against the will of the other person; and (3) while being aided and abetted by one or more other persons [Battle]. Proof of the first two elements, engaging in a sex act with another person by force and against that person's will is sufficient to establish guilt of second-degree sex offense in violation of N.C. Gen. Stat. § 14-27.27(a) (2019).

## B. Aid or Abet

¶ 22 Defendant argues the evidence of element (a)(3): aided or abetted by one or more persons supports the instruction on the lesser-included offense. The trial court instructed the jury on this element of first-degree forcible sex offense:

> "[F]ourth, that defendant was aided or abetted by one or more other persons. A defendant would be aided or abetted by another person if that person was present at the time the sexual offense was committed *and knowingly aided the defendant to commit the crime*. (emphasis supplied).

¶ 23 Mere presence is not enough to meet the burden of aid or abet:

> A person is not guilty of a crime merely because he is present at the scene even though he may silently approve of the crime or secretly intend to assist in its commission; to be guilty he must aid or actively encourage the person committing the crime or in some way communicate to this person his intention to assist in its commission.

*State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999) (citations omitted). "[A] person may be an aider or abettor if he shares the criminal intent of the perpetrator and if, during the commission of the crime, he is in a position to render any necessary aid to the perpetrator." *McKinnon*, 306 N.C. at 298, 293 S.E.2d at 125.

### 1. *Knowledge*

¶ 24    "The aiding element requires some conduct by the accomplice that results in the accomplice becoming involved in the commission of a crime. The typical way in which a party becomes involved in the commission of a crime is through the assistance, promotion, encouragement, or instigation of criminal action". *State v. Bowman*, 188 N.C. App. 635, 648, 656 S.E.2d 638, 648 (2008) (internal quotations omitted). This Court explained that the element of abetting requires "a criminal state of mind-*specifically, it requires that the accomplice has both knowledge of the perpetrator's unlawful purpose to commit a crime, and the intent to facilitate the perpetrator's unlawful purpose.*" *Id.* (emphasis original).

¶ 25    The State argues no contradictory evidence exists to the aiding or abetting elements. It asserts D.C.'s testimony and the audio recording provide clear and unequivocal evidence of Battle's actions before and during the kidnapping and sexual assaults committed by Defendant. Defendant told D.C. she was going to have sex with him and his cousin. Evidence tends to show Defendant has a specific plan to include Battle. Defendant told D.C. again that she was going to engage in a "flip"

while they were in Battle's driveway. Testimony tends to show Defendant used "flip" to mean D.C. would engage in sexual acts with Defendant and somebody else at the same time.

Battle was not merely present, but was recruited by Defendant to assist in the sexual assaults of D.C. Battle willingly accompanied and rode with Defendant and D.C., who had been and was being beaten and crying, to Defendant's sister's house. Defendant told D.C. this "flip" was for Battle. Battle, following instructions from Defendant, waited while Defendant forced D.C. to enter the shed. Defendant forced D.C., by threat of being beaten with pliers, to perform oral sex on him three times in the shed while Battle was present. Battle was present and heard Defendant tell D.C. to "let his cousin get his nut" and that D.C. "was going to suck his d\*\*k and f\*\*k his cousin."

Evidence tends to show Battle helped Defendant to restrain and remove D.C.'s shorts, and Battle stated to D.C. she "might as well get it over with." A reasonable jury could find "it" implies communicating what submission was being expected of D.C. and "get it over with" implies "aid[ing] or actively encourag[ing]" his cousin to sexually assault D.C. as Defendant interchangeably requested oral sex and then demanded D.C. comply with Battle's rape attempts.

Battle was not a passive bystander. Battle assisted, promoted, and encouraged Defendant in the sexual offense. Evidence tends to show Battle knew of

Defendant's unlawful purpose and helped to facilitate the crimes. Battle was a willing participant in the numerous sexual offenses committed against D.C.

## 2. *Relation to Perpetrator*

> The communication or intent to aid does not have to be shown by express words of the defendant but may be *inferred* from his actions and from his *relation to the actual perpetrators*. Furthermore, when the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement.

*Goode*, 350 N.C. at 260, 512 S.E.2d at 422. (emphasis supplied).

Battle and Defendant are cousins. Defendant told D.C. the "flip" was for Battle. As Defendant and Battle approached the car, both of them were smiling and laughing. Battle cooperated with Defendant's orders and waited in the shed. During the forced oral sex, Defendant instructed Battle to get his penis erect so that Battle could rape D.C. Defendant beat D.C. while Battle was exposed and watched, before forcing her to perform oral sex on him a second time. Defendant stopped forcing D.C. to perform oral sex and worked with Battle to forcibly remove D.C.'s shorts and to bend her over the chair.

After Battle raped D.C., and after D.C. had moved her body to try to stop the rape, Defendant beat her. Battle told D.C. she might as well get "it" over with. Evidence tends to show "it" was the "flip" or sexual acts with multiple people

Defendant and Battle had planned. Defendant again forced D.C. to perform oral sex on himself. The relationship between Defendant and Battle was known and clear.

¶ 31    Battle was a close familial relation to Defendant. D.C. knew of this relationship. The evidence tends to show Battle had a motive in the sexual assault in that he was going to have an opportunity to rape D.C. while Defendant was present and assisting. Finally, his words show that he played an active role in counseling and encouraging Defendant to complete their crimes.

### 3. *Atmosphere to Subvert the Will of the Victim*

¶ 32    "By joining defendant in unclothing and immobilizing [the victim], while performing a series of overt acts that created an atmosphere to subvert the will of [the victim], others are deemed to have contributed to the commission of the crime." *State v. Dick*, 370 N.C. 305, 312, 807 S.E.2d 545, 549 (2017).

¶ 33    The joint actions of Defendant and Battle in removing D.C.'s shorts, physically moving her about the shed, refusing to respond as she pleaded for help and resisted, and uttering words that encouraged D.C. to submit. Battle's words and actions created an atmosphere to subvert the will of D.C. *Id.*

### 4. *Aid or Abet Reversals*

¶ 34    Battle's aiding or abetting Defendant in the sexual assault distinguishes this case from those where courts found a person's mere presence did not amount to counseling or encouraging the commission of a crime. *See State v. Ikard*, 71 N.C. App.

283, 321 S.E.2d 535 (1984) (holding defendant was present but had no knowledge that the crime was to be committed and did not know others were armed); *State v. Gaines*, 260 N.C. 228, 132 S.E.2d 485 (1963) (holding the defendant had no knowledge of the crime and only ran with the defendant after he was discovered); *State v. Forney*, 310 N.C. 126, 310 S.E.2d 20 (1984) (holding the defendant's uncontradicted testimony that he "didn't do nuthin," and that he was "thrown" on the victim is not enough to be deemed aiding or abetting).

No evidence rebuts D.C.'s clear testimony and the audio recording of the crimes as they occurred. The recording of the assaults, D.C.'s contemporaneous written account, and her testimony all show Battle was aiding or abetting Defendant's crimes against D.C.

Defendant argues the jury may not have believed all of D.C.'s testimony. Defendant is not entitled to an instruction on a lesser-included offense by merely asserting jury could possibly believe some, but not all, of the State's evidence. *State v. Annadale*, 329 N.C. 557, 568, 406 S.E.2d 837, 844 (1991). The jury also heard the contemporaneous cellphone recording of the beatings and assaults as they occurred.

## VI.   Conclusion

The State's evidence tends to show each element of the offenses charged to support submission to the jury. No contradictory evidence was presented in relation to the third element in question to justify an instruction on a lesser-included offense.

No evidence tends to show Battle was merely a bystander. Battle knowingly aided, abetted, encouraged, and participated with Defendant in his sexual assaults of D.C.

The trial court did not err in denying Defendant's motion for an instruction on a lesser-included offense. Defendant received a fair trial, free from prejudicial errors he preserved and argued. We find no error in the jury's verdicts or in the judgment entered thereon. *It is so ordered.*

NO ERROR.

Judges Inman and Hampson concur.