STATE OF NORTH CAROLINA v. EDWARD LEE CUMMINGS

No. 48A88

(Filed 19 November 1992)

1. **Jury § 7.11 (NCI3d) — exclusion of juror — death penalty views — sentencing phase affected**

Even if the trial judge erred under the *Witherspoon* and *Witt* decisions by improperly excluding a prospective juror in a capital trial because of his death penalty views, the trial judge did not in any way unconstitutionally discriminate against the juror, and such error affects only the sentencing phase of the trial.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

2. **Criminal Law § 860 (NCI4th) — question by prospective juror — time served under life sentence — failure to instruct — sentencing phase affected**

Assuming that the trial judge failed properly to instruct a prospective juror who inquired about the length of time someone sentenced to life imprisonment would actually serve, the appropriate relief would be a new sentencing proceeding, not a new trial.

**Am Jur 2d, Trial § 1441.**

3. **Constitutional Law § 342 (NCI4th) — capital trial — bench conferences — exclusion of defendant — right to presence at trial**

Defendant's unwaivable state constitutional right to presence at his capital trial was not violated by forty-nine bench conferences from which defendant was excluded where defendant was present in the courtroom during each of those conferences and each bench conference was attended by defendant's attorneys. N.C. Const. art. I, § 23.

**Am Jur 2d, Constitutional Law § 842; Trial § 226.**

**4. Criminal Law § 507 (NCI4th) — recordation of statements from bench — private bench conferences — statute inapplicable**

The statute requiring recordation of "all statements from the bench," N.C.G.S. § 15A-1241(a), does not apply to private bench conferences between the trial judge and attorneys for both sides. If, however, either party requests that the subject matter of a private bench conference be put on the record for possible appellate review, the trial judge should comply by reconstructing, as accurately as possible, the matter discussed. N.C.G.S. § 15A-1241(c).

**Am Jur 2d, Trial § 180.**

**5. Constitutional Law § 342 (NCI4th) — unrecorded bench conferences — due process**

The trial judge did not violate defendant's federal due process rights by holding unrecorded bench conferences during a capital trial where the attorneys for both sides were present at the conferences and defendant did not request that the subject matter of any bench conference be reconstructed for the record.

**Am Jur 2d, Trial § 0000.**

**6. Homicide § 552 (NCI4th) — first degree murder — second degree instruction not required**

The trial judge in a first degree murder prosecution did not err in refusing to instruct the jury on the lesser included offense of second degree murder where there was no evidence to negate the elements of premeditation and deliberation other than defendant's denial, and the State's evidence tended to show that the victim was shot once in the back of the head at close range and once in the face; she was stripped naked, wrapped in two layers of plastic and a sheet, and buried in a shallow grave within one and one-half miles of defendant's house; the tips of her fingers were missing from both hands and the fingertips from at least one of her hands were removed prior to her burial; defendant blamed the victim for the death of his infant son less than five months prior to the victim's disappearance; and black plastic trash bags found around the victim's body were purchased on the same day the victim was reported missing.

**Am Jur 2d, Trial § 1427.**

7. **Evidence and Witnesses § 305 (NCI4th)— another murder— admissibility to show identity and method of operation**

In this prosecution for first degree murder, evidence concerning the murder of the victim's sister was admissible under Rule of Evidence 404(b) to show defendant's identity and method of operation where the evidence tended to show that both the victim and her sister were acquainted with defendant (although in different ways); both had strained relationships with defendant (although for different reasons); both died as a result of a gunshot wound to the back of the head; both were found naked, buried within one hundred yards of each other and within one and one-half miles of defendant's house; both had been methodically wrapped in two types of plastic and a cloth sheet; and both had extremities removed (the victim's fingertips and her sister's arm). Furthermore, the probative value of evidence of the sister's death was not substantially outweighed by the danger of unfair prejudice so as to require its exclusion under Rule of Evidence 403.

**Am Jur 2d, Evidence §§ 321, 322.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed 781.**

8. **Evidence and Witnesses § 1694 (NCI4th)— photographs of graves and autopsies of murder victims**

The trial court in a first degree murder prosecution did not abuse its discretion in the admission of twenty-three photographs of the autopsies of the victim and her sister and the graves in which the bodies were found where the photographs were used to illustrate the testimony of the doctors who performed the autopsies describing the cause of death and the manner of the killing of each sister, and the evidence was crucial to the State's theory that both sisters were killed by the same person.

**Am Jur 2d, Evidence § 792.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

9. **Evidence and Witnesses § 1662 (NCI4th)— photographs— admissibility to support State's theory of murders**

The trial court in a first degree murder case did not abuse its discretion in the admission of photographs belonging to defendant of several women acquaintances posing nude or partially nude, including the victim's sister, where the State used the photographs to demonstrate a pattern of behavior to explain the deaths of the victim and her sister, and at the time the photographs were introduced, there had already been evidence of defendant's sexual exploits and the fact that he had asked women to pose nude for photographs.

**Am Jur 2d, Evidence §§ 787, 790.**

10. **Evidence and Witnesses § 282 (NCI4th)— character witness— cross-examination—specific acts of misconduct**

The trial court in a first degree murder prosecution did not err in allowing the State to ask three witnesses whether they were aware of an assault committed by defendant twenty-five years earlier after defendant's attorneys had elicited testimony from the witnesses that they had never known defendant to be a violent person. Any conduct that rebuts earlier reputation or opinion testimony offered by the defendant is a "relevant" specific instance of conduct admissible under N.C.G.S. § 8C-1, Rule 405(a), and this Rule contains no time limit.

**Am Jur 2d, Evidence § 340.**

**Opinion evidence as to character of accused under Rule 405(a) of Federal Rules of Evidence. 64 ALR Fed 244.**

11. **Criminal Law § 1347 (NCI4th)— first degree murder—course of conduct aggravating circumstance—murders of sisters— common motive and modus operandi**

The trial court did not err in submitting the course of conduct aggravating circumstance to the jury in a first degree murder prosecution based on defendant's murder of the victim's sister some twenty-six months after the victim's murder where the evidence showed that the motive and *modus operandi* were similar in both murders. An inference that defendant's violent behavior toward the two sisters was motivated by an overpowering desire to somehow assert his relationship with his children was supported by evidence that defendant believed that the victim had killed defendant's infant son by

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

means of smothering and that defendant avenged this death by killing the victim, and that defendant killed the victim's sister to prevent her from obtaining legal custody of the couple's two children. Additionally, a common *modus operandi* was shown by evidence that both sisters were shot in the back of the head, both were naked at the time of their deaths, both were wrapped in layers of black and clear plastic and cloth sheets in similar shallow graves located only one and one-half miles from defendant's home, and extremities of both victims were removed (part of an arm in one case and fingertips in the other), apparently in an effort to prevent identification of the bodies. Alternatively, the jury could have inferred course of conduct on the basis of testimony by defendant's cellmate that defendant had stated that he killed the sisters because he believed that they had gotten the better of him in a cocaine deal. N.C.G.S. § 15A-2000(e)(11).

**Am Jur 2d, Criminal Law § 525.**

**12. Criminal Law § 1352 (NCI4th)— McKoy error—new sentencing hearing**

A defendant sentenced to death for first degree murder is entitled to a new sentencing hearing because of *McKoy* error in the trial court's instructions requiring unanimity for mitigating circumstances where there was evidence supporting at least some of the mitigating circumstances submitted to but not found by the jury.

**Am Jur 2d, Criminal Law § 525.**

Justice FRYE dissenting as to sentence.

Chief Justice EXUM joins in this dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Herring, J., at the 7 November 1987 Criminal Session of Superior Court, New Hanover County. Heard in the Supreme Court 14 November 1991.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

MEYER, Justice.

Defendant, Edward Lee Cummings, argues that each of seven alleged errors by the trial court entitles him to a new trial. In the alternative, defendant argues that alleged errors in the sentencing proceeding require this Court to vacate his death sentence. We find no error in the guilt-innocence phase of defendant's trial but vacate the death sentence and remand the case for a new capital sentencing proceeding because of *McKoy* error that we do not find harmless beyond a reasonable doubt.

Defendant was indicted by a Hoke County grand jury on 20 February 1986 for the murders of Teresa Annette Puryear (Teresa) and her older sister, Karen Marie Puryear (Karen).[1] This appeal concerns only defendant's conviction for Teresa's murder. After a change of venue, granted by Judge Herring because of extensive media coverage, defendant was tried capitally before a New Hanover County jury. Defendant was convicted of first-degree murder, and the jury recommended that he be sentenced to death. Judge Herring imposed the death sentence, and defendant appeals to this Court as of right.

Evidence presented at defendant's trial shows the following. On 13 January 1986, workers baling pine straw in a wooded area of Hoke County near McCain discovered a female body in a shallow grave. Sheriff's officials were notified, and upon further investigation, a second female body was discovered buried within 125 feet of the first. The property where the bodies were found is owned by the State of North Carolina and is approximately 1.5 miles from a house owned by defendant. The bodies were removed from the site under the supervision of the Office of the Chief Medical Examiner in Chapel Hill and were later identified as Karen and Teresa Puryear.

Autopsies performed by forensic pathologists Page Hudson and Michael Sullivan revealed that both victims had been shot in the back of the head, both were naked, and both were wrapped in layers of black and clear plastic and cloth sheets.

---

1. The trial court granted defendant's motion to sever. *State v. Cummings*, 326 N.C. 298, 303, 389 S.E.2d 66, 69 (1990). Defendant was convicted and sentenced to death for the first-degree murder of Karen Puryear at the 6 April 1987 Criminal Session of Superior Court, Hoke County. *Id.* at 303, 389 S.E.2d at 69-70. This Court found no error in the guilt phase of that trial but remanded for a new sentencing proceeding. *Id.* at 325, 389 S.E.2d at 81.

The autopsy of Teresa also revealed that her body was in an advanced state of decomposition, she had a second gunshot wound to the face, and the tips of her fingers were missing. When Teresa's body was discovered, her right hand and arm were exposed, and Dr. Sullivan testified that this exposure could explain the absence of her fingertips on that hand. However, because Teresa's left hand and arm were wrapped in plastic, Dr. Sullivan opined that her fingertips on this hand had been removed prior to her burial. The cause of death, according to Dr. Sullivan, was the gunshot wound to the back of her head.

The autopsy of Karen also revealed that her body was somewhat decomposed, that the lower portion of her right arm was missing, and that there was a three and one-half inch cut-like wound on her lower left abdomen. Dr. Hudson testified that this cut was likely inflicted after Karen's death. The cause of death, according to Dr. Hudson, was the gunshot wound to the back of her head.

Defendant was born in Hoke County in May 1941, completed the ninth grade, and worked in tobacco and construction most of his life. He also owned two nightclubs. Although he lived in Willow Springs, defendant also owned property and a house in Hoke County. In May 1974, defendant met Faye Puryear, mother of Teresa and Karen, at a Raleigh nightspot. Defendant met Karen later that year when she returned to her mother's custody from a foster home. Early in 1981, defendant and Karen became involved romantically. Defendant, who was already married with children, was about forty years old when he became involved with Karen; she was around seventeen. During their relationship, Karen bore defendant three children. One of the children, Clifford Allen, died on 29 April 1983 of sudden infant death syndrome at the age of five weeks. Although the baby's death certificate stated that he died from natural causes, three witnesses testified for the State that defendant blamed Teresa for the child's death. Defendant believed Teresa may have smothered the baby.

Less than five months after the baby's death, on 16 September 1983, Teresa disappeared. She was fifteen years old. There was speculation that Teresa had left home with Mexican migrant workers.

In late 1985, Karen took out a nonsupport warrant against defendant; a hearing was scheduled for 20 November. Also, on 22 October 1985, Karen talked with officials at legal aid in Wake County about gaining legal custody of her and defendant's two

children. Celia Mansaray, a paralegal at legal aid, testified that Karen said defendant had taken their two children away from her on 15 October 1985 and refused to return them. Defendant said he would shoot Karen if she tried to come and get them. After discussing the procedure for gaining legal custody of her children, Karen indicated that she would talk with defendant and that she would get back in touch with Ms. Mansaray. Karen never returned to legal aid. She disappeared on 14 November 1985—six days before the scheduled nonsupport hearing. She was twenty-two years old.

The State's evidence linking defendant to Teresa's murder included testimony from SBI Agent Troy Hamlin that a black plastic trash bag found wrapped around Teresa's body had come from the same box of Bes-Pak Good 'N Tuff trash bags seized during a search of defendant's Hoke County house. Hamlin, a forensic chemist with the state crime laboratory, testified that he "matched the bottom portion of one of the bags from the gravesite from Teresa Puryear . . . to an open end of another garbage bag found in the [defendant's] Hoke County home." Hamlin also testified that plastic trash bags found wrapped around Karen's body also came from the box of Bes-Pak trash bags found in defendant's house.

During their search of defendant's Hoke County house, which was unoccupied and unfinished, police also discovered a receipt from a Big Star supermarket which listed the purchase of one item for $1.09. Jerry Parsek, general manager of a Fayetteville Big Star in 1983, testified that the sales receipt had the notation NFSG printed on it, indicating that the item purchased was a nonfood staple good. Mr. Parsek testified that Bes-Pak Good 'N Tuff trash bags were categorized as nonfood staple goods and sold for $1.09 on 16 September 1983, the date printed on the receipt. Teresa Puryear disappeared the same day.

The State also presented the testimony of Fred Jacobs, who in May 1986 shared a Hoke County jail cell with defendant. Jacobs testified that defendant said he had killed two sisters and had broken the arm off one of them. Defendant, according to Mr. Jacobs, said he had killed the sisters because "they had ripped him off on the cocaine deal."

Defendant testified in his own behalf. He denied having anything to do with Teresa's disappearance. He also denied buying the Bes-Pak trash bags or ever seeing the trash bags in his Hoke County house.

## STATE v. CUMMINGS

[332 N.C. 487 (1992)]

Additional facts will be set forth as necessary with respect to the various issues.

## I.

### JURY SELECTION

[1] In his first two assignments of error, defendant argues that he is entitled to a new trial because: (1) the trial judge erred in excusing a prospective juror because of the juror's views concerning the death penalty, *see Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968); and (2) the trial judge failed to properly instruct a prospective juror who inquired about the length of time someone sentenced to life imprisonment would actually serve. While we find no error in either of these arguments, assuming, *arguendo*, that defendant is correct concerning his *Witherspoon/Witt* challenge, the appropriate relief would be a new *sentencing proceeding*, not a new trial. *See State v. Robinson*, 327 N.C. 346, 358-59, 395 S.E.2d 402, 409 (1990) (error under *Witherspoon* and *Witt* affects only the sentencing proceeding). At oral argument, defendant asked this Court to reconsider its holding in *Robinson* that error under *Witherspoon* and *Witt* affects only the sentencing phase of a capital trial. Defendant argues that the United States Supreme Court's recent decision in *Powers v. Ohio*, --- U.S. ---, 113 L. Ed. 2d 411 (1991), requires a different result. In *Powers*, the Court held that a white defendant had standing to assert an equal protection claim on behalf of a black venireperson who was excluded by the prosecution solely because of his race. *Id*. The Court held that although an individual juror does not have the right to serve "on any particular petit jury, . . . he or she does possess the right not to be excluded from one on account of race." *Id*. at ---, 113 L. Ed. 2d at 424. Furthermore, the Court held that a criminal defendant has standing to raise the equal protection rights of the excluded juror. *Id*. at ---, 113 L. Ed. 2d at 425. Defendant argues, therefore, that the excluded juror in this case also had a right to serve on defendant's jury and that he (defendant) has standing to raise the issue on appeal.

Defendant misreads *Powers*. The Court's decision was clearly predicated on the equal protection rights of a juror excluded solely on account of his race. Stated differently, it is this unconstitutional discrimination that triggers the juror's claim under the Equal Protection Clause of the Fourteenth Amendment. In fact, the Court, as quoted above, explicitly stated that a juror does not

have the right to serve on any particular jury. *Id*. at ---, 113 L. Ed. 2d at 424.

Thus, even if the trial judge in this case erred by improperly excluding a prospective juror under *Witherspoon* and *Witt*, the trial judge did not in any way unconstitutionally *discriminate* against the juror. At most, the trial judge erred in determining that the juror's beliefs concerning the death penalty would substantially impair the juror's ability to perform his duty during the sentencing phase of the trial. *See Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52. We thus reject defendant's argument that *Powers* mandates a different result than the one we reached in *Robinson*.

**[2]** Implicit in defendant's second assignment of error is his belief that a juror, laboring under misconceptions as to when a convicted felon is eligible for parole, might impose the death penalty in lieu of life imprisonment. Therefore, even assuming error, the appropriate relief would, again, be a new *sentencing proceeding*, not a new trial. We thus find it unnecessary to address the merits of this argument.

## II.

### GUILT-INNOCENCE PHASE

In his third assignment of error, defendant takes exception to forty-one unrecorded bench conferences held outside defendant's presence. Defendant argues that he is entitled to a new trial because the bench conferences (1) violated defendant's unwaivable right to presence in a capital case under Article I, Section 23 of the North Carolina Constitution; (2) were not recorded as required by N.C.G.S. § 15A-1241; and (3) violated defendant's federal constitutional right to due process of law given a state statutory entitlement.

**[3]** Since defendant filed his brief in this case, we have considered in detail the question of when a defendant's unwaivable right to presence in a capital case is violated by unrecorded bench conferences from which the defendant is excluded. *See State v. Buchanan*, 330 N.C. 202, 208-24, 410 S.E.2d 832, 835-45 (1991). We concluded in *Buchanan* that a defendant's right to presence under our state Constitution is not violated when: (1) the defendant is physically present in the courtroom, and (2) the defendant is represented at the bench conference by his attorney. *Id*. at 223, 410 S.E.2d at 844-45. The defendant's presence in the courtroom

allows him to "observe the context of each conference," while the presence of his attorney at the bench conference provides the defendant with "constructive knowledge of all that transpired." *Id.* at 223, 410 S.E.2d at 844.

In this case, a review of the transcript reveals that each of the forty-one bench conferences cited by defendant was attended by defendant's attorneys. Furthermore, defendant was present in the courtroom during each of these conferences. We therefore hold that defendant's state constitutional right to presence was not violated by these bench conferences.

[4] Next, defendant argues that these bench conferences should have been recorded pursuant to N.C.G.S. § 15A-1241 and that the failure to record implicates defendant's federal due process rights. Defendant's argument is based upon a literal reading of N.C.G.S. § 15A-1241(a), which requires recordation of "all statements from the bench." N.C.G.S. § 15A-1241(a) (1988). The State argues that the phrase "statements from the bench" was intended to include only those statements made in the presence of the jury—not routine bench conferences between trial judges and attorneys. We agree with the State, at least insofar as it argues that the phrase "statements from the bench" does not include private bench conferences between trial judges and attorneys.

N.C.G.S. § 15A-1241 reads, in pertinent part:

(a) The trial judge must require that the reporter make a true, complete, and accurate record of all statements from the bench and all other proceedings except:

(1) Selection of the jury in noncapital cases;

(2) Opening statements and final arguments of counsel to the jury; and

(3) Arguments of counsel on questions of law.

. . . .

(c) When a party makes an objection to unrecorded statements or other conduct in the presence of the jury, upon motion of either party the judge must reconstruct for the record, as accurately as possible, the matter to which objection was made.

N.C.G.S. § 15A-1241(a), (c). We do not believe the enactment of this statute by the legislature in 1977 was intended to change the time-honored practice of off-the-record bench conferences between trial judges and attorneys. If the legislature had intended to make such a radical change in trial procedure, we feel confident it would have done so explicitly. Instead, section 15A-1241(a) appears to be designed to ensure that any statement by the trial judge, in open court and within earshot of jurors or others present in the courtroom, be available for appellate review. If, however, either party requests that the subject matter of a private bench conference be put on the record for possible appellate review, the trial judge should comply by reconstructing, as accurately as possible, the matter discussed. *Cf.* N.C.G.S. § 15A-1241(c) (once objection is made, trial judge must reconstruct unrecorded statements or other conduct in the presence of the jury).

[5]   In this case, defendant's trial attorneys attended each of the forty-one bench conferences cited by defendant's appellate attorney. In no instance do we find that defendant requested the subject matter of a bench conference be reconstructed for the record; in fact, defendant's attorneys requested more than half of these off-the-record conferences.

    For the reasons cited above, we hold that the trial judge did not err by holding unrecorded bench conferences with attorneys for both sides.

[6]   In his fourth assignment of error, defendant argues that he is entitled to a new trial because the trial judge refused his request to instruct the jury on the lesser included offense of second-degree murder. Defendant argues that, based on the evidence presented, a rational jury could have determined that defendant killed Teresa, but did so without the specific intent, premeditation, and deliberation necessary for first-degree murder. The State contends that the evidence does not support a second-degree murder instruction; thus, the trial judge did not err by instructing the jury only on first-degree murder. We agree with the State.

    It is well settled that a defendant is not entitled to an instruction on second-degree murder in every case in which he is charged with first-degree murder. *State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288 (1991); *State v. Annadale*, 329 N.C. 557, 406 S.E.2d 837 (1991); *State v. Stevenson*, 327 N.C. 259, 393 S.E.2d 527 (1990); *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990) (*Cummings I*);

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

*State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Although second-degree murder is a lesser included offense of first-degree murder, a trial court does not have to submit a verdict of second-degree murder to the jury unless there is evidence to support it. *Annadale*, 329 N.C. at 567, 406 S.E.2d at 843. The test for whether a judge is required to instruct on second-degree murder was set out in *Strickland* as follows:

> The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Strickland*, 307 N.C. at 293, 298 S.E.2d at 658. "If, however, there was any positive evidence tending to support the lesser included offense of second-degree murder, then it was the trial court's duty to submit a possible verdict for that lesser included offense after appropriate instructions." *Stevenson*, 327 N.C. at 263, 393 S.E.2d at 529.

In this case, there was evidence to support each and every element of first-degree murder, including premeditation and deliberation, and absolutely no evidence to negate these elements other than defendant's denial. The State's evidence showed that Teresa was shot once in the back of the head at close range and once in the face; the shot to the back of the head was the fatal shot. She was stripped naked, wrapped in two layers of plastic and a sheet, and buried in a shallow grave within one and one-half miles of defendant's house. The tips of her fingers were missing from both hands, and the forensic pathologist who conducted the autopsy testified that the fingertips from at least one of her hands were removed prior to her burial. In addition to this physical evidence, there was testimony that defendant blamed Teresa for the death of his infant son Clifford, the death occurring less than five months prior to Teresa's disappearance. Furthermore, there was evidence suggesting that black plastic trash bags found wrapped around Teresa's body were purchased *on the same day* Teresa was reported missing.

Defendant argues that evidence of an "unstable and volatile relationship" between defendant and Teresa was sufficient to allow jurors to infer that her death was caused by an "unpremeditated or non-deliberated killing." Although there was evidence that defendant and Teresa disliked one another, we believe this evidence, when combined with all the physical evidence described above, only strengthens the State's argument that defendant was either guilty of first-degree murder by premeditation and deliberation or, as he claimed at trial, not guilty at all. We therefore hold that the trial judge did not err by refusing to instruct the jury on second-degree murder. This assignment of error is rejected.

**[7]** In his fifth assignment of error, defendant argues that he is entitled to a new trial because the trial judge erred in admitting testimony concerning the death of Teresa's sister, Karen. Defendant argues that this testimony should have been excluded because it was, at best, minimally relevant and because its prejudicial effect greatly outweighed any probative value it might have had. The State argues that this evidence was properly admitted under Rule of Evidence 404(b) and points out that this Court found no error in *Cummings I* when this same defendant objected to the introduction of evidence concerning Teresa's death during his trial for Karen's murder. *See Cummings I*, 326 N.C. at 311, 389 S.E.2d at 73. We agree with the State that evidence surrounding Karen's death was admissible under Rule 404(b).

Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1988). Recently, this Court emphasized that Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990); *see also State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990); *State v. Jeter*, 326 N.C. 457, 389 S.E.2d 805 (1990). " 'Relevant evidence' means

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988), *quoted in Coffey*, 326 N.C. at 278, 389 S.E.2d at 54. Evidence surrounding Karen's relationship with defendant and her subsequent disappearance and death was therefore properly admitted if it was "relevant to any fact or issue other than the character of the accused." *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986).

Evidence of Karen's murder, when placed side by side with evidence of Teresa's murder, tended to show that both Karen and Teresa were acquainted with defendant (although in different ways); both had strained relationships with defendant (although for different reasons); both died as a result of a gunshot wound to the back of the head; both were found naked, buried within one hundred yards of each other and within one and one-half miles of defendant's house; both had been methodically wrapped in two types of plastic and a cloth sheet; and both had extremities removed—Karen's arm and Teresa's fingertips. Given the similarities between the two murders, we hold that the evidence of Karen's murder was admissible under Rule 404(b) to show defendant's identity and method of operation. *See Cummings I*, 326 N.C. at 310-11, 389 S.E.2d at 72-73 (evidence concerning Teresa's murder admitted into evidence during defendant's trial for Karen's murder for purpose of showing identity).

Defendant also argues, however, that even if evidence surrounding Karen's death was technically admissible under Rule 404(b), it should have been excluded under Rule of Evidence 403 because its probative value was "substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1988). Although evidence that is admissible under Rule 404(b) may be excluded under Rule 403 because of unfair prejudice to the defendant, such a determination is "a matter left to the sound discretion of the trial court." *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. By definition, "[e]vidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *Id.* We cannot say in this case that Judge Herring abused his discretion by allowing the jury to hear this evidence. Defendant's assignment of error is rejected.

[8] In his sixth assignment of error, defendant argues that he is entitled to a new trial because of the admission into evidence of photographs that he contends were either irrelevant or unduly prejudicial. For the reasons outlined below, we hold that the trial judge did not abuse his discretion by admitting these photographs into evidence.

The photographs can be divided into two main groupings: (1) twenty-three photographs of the graves and autopsies of Karen and Teresa Puryear,[2] and (2) photographs belonging to defendant of women acquaintances posing nude or partially nude. We will address each grouping in turn.

The following photographs were admitted into evidence concerning Teresa's murder: one photograph of Teresa's grave to illustrate the testimony of Samuel McNair, who found the grave; three photographs of Teresa's grave to illustrate the testimony of Dr. Sullivan, who supervised the removal of Teresa's body from the grave; three photographs of Teresa's body wrapped in layers of plastic and a cloth sheet to illustrate the testimony of Dr. Sullivan, who performed the autopsy; and two photographs of Teresa's body to illustrate Dr. Sullivan's testimony concerning the autopsy.

The following photographs were admitted into evidence concerning Karen's murder: five photographs of Karen's grave to illustrate the testimony of Dr. Hudson, who supervised the removal of Karen's body from the grave; five photographs of Karen's body as it was being unwrapped from its plastic and sheet covers to illustrate the testimony of Dr. Hudson, who performed the autopsy; and four photographs of Karen's body to illustrate Dr. Hudson's testimony concerning the autopsy.

The admission into evidence at a murder trial of photographs with inflammatory potential was exhaustively reviewed by this Court in *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). What we said in *Hennis* is particularly instructive in this case:

Photographs are usually competent to explain or illustrate anything that is competent for a witness to describe in words,

2. It is unclear from defendant's brief exactly which of the twenty-three photographs concerning Karen and Teresa defendant believes were improperly admitted into evidence. He appears to argue that all, or at least most, of these photographs should have been excluded. We will proceed, therefore, as if defendant has objected to each of the twenty-three photographs.

and properly authenticated photographs of a homicide victim may be introduced into evidence under the trial court's instructions that their use is to be limited to illustrating the witness's testimony. Thus, photographs of the victim's body may be used to illustrate testimony as to the cause of death. Photographs may also be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree, and for this reason such evidence is not precluded by a defendant's stipulation as to the cause of death. Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury.

This Court has recognized, however, that when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury. . . .

. . . .

In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion. Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court. Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.

*Hennis*, 323 N.C. at 283-84, 285, 372 S.E.2d at 526-27 (citations omitted).

In making its decision, the trial court must consider the totality of the circumstances, such as "[w]hat a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, [and] the scope and clarity of the testimony it accompanies." *Id.* at 285, 372 S.E.2d at 527.

Accordingly, this Court found abuse of discretion where the jury was shown thirty-five slides of the crime scene and autopsy

projected upon an unusually large screen directly over the defendant, followed by distribution of the thirty-five eight- by ten-inch glossy photographs to jurors one at a time for an hour. *Id.* at 286-87, 372 S.E.2d at 527-28. We also found abuse of discretion in *State v. Mercer*, 275 N.C. 108, 165 S.E.2d 328 (1969), *overruled in part on other grounds by State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975), where the victim, who was shot while in his bed, was shown lying in the funeral home, with "projecting probes indicating the point of entry, the course, and the point of exit[ ] of the bullet that caused his death." *Id.* at 121, 165 S.E.2d at 337. And finally, we found error in *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979), where the trial court allowed into evidence photographs of the victim's mutilated and dismembered body, which had been ravaged by animals, even though the defendant had admitted strangling the victim and there was no evidence that the defendant had mutilated or dismembered his victim. *Id.* at 375-77, 259 S.E.2d at 765-66.

Defendant argues that *Mercer* and *Johnson* support his argument that the trial judge erred by admitting the photographs in this case. We disagree. Unlike *Mercer* and *Johnson*, where the photographs had no probative value with respect to any issue before the jury, the photographs in this case were used to illustrate the testimony of Drs. Sullivan and Hudson describing not only the cause of death, but also the manner of the killing. *See Hennis*, 323 N.C. at 284, 372 S.E.2d at 526 (photographs admissible to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of first-degree murder). This evidence was crucial to the State's theory that both sisters were killed by the same person: someone who shot his victims execution-style in the back of the head, disrobed them, removed body parts (Karen's arm, Teresa's fingertips), and methodically wrapped each body before burying them in shallow graves.

Furthermore, the photographic evidence was neither excessive nor repetitious and was "not aimed solely at arousing the passions of the jury." *See id.* at 284, 372 S.E.2d at 526. In fact, Judge Herring kept from the jury two particularly "gross" photographs of Karen's face, concluding that their probative value was outweighed by their possible prejudicial effect. We conclude, therefore, that the trial judge did not abuse his discretion by allowing these photographs into evidence. *See State v. Bearthes*, 329 N.C. 149, 405 S.E.2d 170 (1991) (trial court did not err by allowing into evi-

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

dence twelve photographs of autopsy); *Robinson*, 327 N.C. 346, 395 S.E.2d 402 (trial court did not err by allowing into evidence twenty-three crime scene and autopsy photographs and slides).

Defendant also argues that it was prejudicial error for the trial judge to allow into evidence photographs of women acquaintances posing nude or partially nude. Defendant argues that these photographs were not relevant to any issue and were highly prejudicial. He relies on *State v. Rinaldi*, 264 N.C. 701, 142 S.E.2d 604 (1965), in which the defendant, having been convicted of murdering his wife, was awarded a new trial because the State offered evidence that the defendant had made homosexual advances to a State's witness whom defendant had sought to hire to commit the murder. This Court said it was unfair to allow a jury to be prejudiced to the detriment of the defendant "by evidence tending to prove that he is a moral degenerate." *Id.* at 705, 142 S.E.2d at 607. As explained by this Court in *State v. Small*, 301 N.C. 407, 272 S.E.2d 128 (1980), it is error for the State in a prosecution of one crime to offer evidence tending to show that the defendant has committed another crime or act "when the *sole* purpose of the evidence is, generally, to show that the defendant is a bad person and, therefore, predisposed to commit criminal acts generally." *Id.* at 433, 272 S.E.2d at 144. We find *Rinaldi* distinguishable from this case.

Throughout defendant's trial, prosecutors attempted to portray defendant as a sexually promiscuous married man who kept detailed records of the women with whom he had sex.[3] One of the State's witnesses testified that she and her cousin moved into defendant's home as live-in "babysitters" shortly after Karen disappeared. The witness testified that she had sex with defendant and that defendant asked both her and her cousin to pose nude for photographs.

[9] During defendant's cross-examination, the State sought to introduce into evidence photographs of several nude or partially nude women, including photographs of Karen partially nude. The photographs were discovered by police during a search of defendant's house. Defendant's attorneys objected, arguing that the photographs were irrelevant and unduly prejudicial. After sending

---

3. The State introduced into evidence defendant's "Believe It or Not" book, a notebook containing the names of 112 women, many of whom, according to defendant's testimony, were former sexual partners.

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

the jury out of the courtroom, Judge Herring heard arguments and denied defendant's motion. During questioning by the prosecutor, defendant identified the women in the photographs. When asked whether he personally took pictures of nude women, defendant said he did so occasionally.

In her closing argument to the jury, the prosecutor argued that "[t]he Defendant has been shown to have what could fairly be described as an unusual and unnatural interest in photographs of nude young women. Do you think it was just a coincidence that the bodies of both girls had been stripped naked, or was it calculation by that Defendant?" She also argued to the jury that defendant "seems to have a very warped attitude towards women. . . . Given his attitude, how do you think Edward Lee Cummings would have felt about a woman [Karen] taking him to court for child support? And who disappeared six days before the court date on that non-support charge? Coincedence [sic] or the motive for cold-blooded murder?"

Unlike *Rinaldi*, in which there was absolutely no connection between the crime for which the defendant was accused and the evidence of his homosexual tendencies, the State in this case sought to demonstrate a pattern of behavior to explain the deaths of Karen and Teresa Puryear. At the time the pictures were introduced, there had already been evidence of defendant's sexual exploits and the fact that he had asked two women to pose nude for photographs. Given the State's theory of the case, we cannot say that the trial judge abused his discretion by allowing these photographs into evidence.

[10] In his seventh assignment of error, defendant argues that the trial judge erred by allowing the State to ask three witnesses whether they knew of or were aware of an assault committed by defendant in 1963. Defendant argues that, because this assault was nearly twenty-five years old, it was not relevant under Rule of Evidence 405(a). Even if relevant, defendant argues, it should have been excluded under Rule of Evidence 403. We hold that the trial judge did not err in allowing the testimony.

Rule of Evidence 405 states, in pertinent part:

(a) *Reputation or opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testi-

mony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*

N.C.G.S. § 8C-1, Rule 405(a) (1988) (emphasis added). One instance in which character evidence is admissible under our Rules of Evidence is when a pertinent trait of character is offered by an accused. N.C.G.S. § 8C-1, Rule 404(a)(1).

In this case, the prosecutor asked three witnesses about an assault committed by defendant in 1963 only *after* defendant's attorneys had elicited testimony from the witnesses that they had never known defendant to be a violent person. Defendant does not argue that the prosecutor did not have a good-faith basis for believing the assault took place, only that the age of the incident renders it irrelevant. We disagree. A "relevant" specific instance of conduct under Rule 405(a) would be any conduct that rebuts the earlier reputation or opinion testimony offered by the defendant. Rule 405(a) contains no time limit, as does Rule of Evidence 609 (impeachment by prior conviction), and we see no reason to impose one.

That does not mean, however, that evidence of a past "instance of conduct" can never be excluded because of its age or for another reason if the trial judge determines, under Rule 403, that the probative value of the rebuttal evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." N.C.G.S. § 8C-1, Rule 403. This determination, whether evidence should be excluded under Rule 403, is a matter within the sound discretion of the trial judge. *State v. Penley*, 318 N.C. 30, 41, 347 S.E.2d 783, 789 (1986). In this case, defendant's attorney specifically mentioned Rule 403 to Judge Herring after objecting to the admission of this evidence. We do not believe the trial judge abused his discretion by allowing the evidence. We reject this assignment of error.

## III.

### SENTENCING PROCEEDING

[11] Defendant argues that his death sentence must be vacated because the trial judge erred by submitting the "course of conduct" aggravating circumstance to the jury. Karen's murder, the "other crime of violence" that the trial judge found to be part of a course of conduct, occurred twenty-six months after Teresa's murder, the crime for which defendant was convicted. We disagree.

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

N.C.G.S. § 15A-2000(e)(11) provides that jurors in a capital sentencing proceeding may deem other violent criminal conduct as part of a course of conduct, and hence an aggravating circumstance, when

> [t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

N.C.G.S. § 15A-2000(e)(11) (1988). We have previously concluded that the course of conduct circumstance itself does not violate due process by reason of unconstitutional vagueness. *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983).

We have previously held that the jury's consideration of any factor relevant to the criminal conduct that is being deliberated upon may not be restricted. *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). In *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), we stated:

> In order to prevent an arbitrary or erratic imposition of the death penalty, the State must be allowed to present, by competent relevant evidence, any aspect of the defendant's character or record and any of the circumstances of the offense that will substantially support the imposition of the death penalty.

*Id.* at 23-24, 301 S.E.2d at 322.

In *Williams*, 305 N.C. 656, 292 S.E.2d 243, we approved the following jury instruction regarding course of conduct:

> Now, ladies and gentlemen, the murder of [the victim] by the defendant was part of such a course of conduct if it and other crimes of violence were parts of a pattern of intentional acts directed toward the perpetration of such crimes of violence which establishes that there existed in the mind of the defendant a plan, scheme, or design involving both the murder of [the victim] and other crimes of violence.

*Id.* at 685, 292 S.E.2d at 261. Our pattern jury instruction, which was used by the trial court in the instant case, mirrors this instruction, relating that a murder is part of a course of conduct "if it[ ] and the other crimes of violence are part of a pattern of the same or similar acts which establish that there existed in the mind of the defendant a plan, scheme, system or design involving both the murder and those other crimes of violence." N.C.P.I.—Crim. 150.10(11) (1990). In determining whether the evidence tends to show that another crime and the crime charged were part of a course of conduct, and therefore constitute a proper basis to submit the course of conduct aggravating circumstance to the jury, the trial court must consider "a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons." *State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated*, --- U.S. ---, 112 L. Ed. 2d 7, *on remand*, 327 N.C. 479, 397 S.E.2d 233 (1990).

Our prior cases in this area have involved relatively short periods of time. *E.g., State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (woman kidnapped from car and raped immediately after man with whom she was driving was killed by defendant), *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991); *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988) (child killed within hours of her mother's death after she awoke while defendant was disposing of her mother's body), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 330 N.C. 66, 408 S.E.2d 732 (1991); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986) (immediately after killing victim, defendant fired gun at another), *overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984) (in rapid succession, defendant killed sister and father of estranged wife), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369, *reh'g denied*, 471 U.S. 1050, 85 L. Ed. 2d 342 (1985); *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740 (woman killed and husband beaten within moments of each other), *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243 (service station employee and convenience store employee killed in different towns within hours of each other during back-to-back robberies). In all these cases, we found no error in the trial court's submission of the course of conduct aggravating circumstance to the jury.

In *State v. Price*, 326 N.C. 56, 388 S.E.2d 84, the other crimes of violence, arson and hostage-taking, occurred *five days* after the

murder for which the defendant was being prosecuted. We concluded that all the crimes of violence were elements of a five-day rampage, evoking a common *modus operandi* and motivation. *Id.* at 82, 388 S.E.2d at 98. Therefore, based on the proximity in time, five days, and the common *modus operandi* and motivation, we held that it was not improper for the trial judge to submit the course of conduct aggravating circumstance to the jury. *Id.* at 83, 388 S.E.2d at 99.

Obviously, the closer the incidents of violence are connected in time, the more likely that the acts are part of a plan, scheme, system, design, or course of action. The further apart the acts are temporally, the more incumbent it is upon a court to carefully consider other factors, such as *modus operandi* and motivation, in determining whether the acts of violence are part of a course of conduct. Thus, in order to find course of conduct, a court must consider the circumstances surrounding the acts of violence and discern some connection, common scheme, or some pattern or psychological thread that ties them together. Conceivably, a murder could be committed as a "part of a course of conduct," although the acts occurred over a period of years, if, for instance, there was a clear pattern of systematic killing of several members of the same family or of co-conspirators of the same crime or other group, or serial killings, rapes, or other crimes of a serial nature. The course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), does not specifically employ the term "temporal proximity"; it merely provides:

> The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

N.C.G.S. § 15A-2000(e)(11).

Ordinarily, the role of temporal proximity in assessing whether separate violent crimes are part of a violent course of conduct is properly a matter for the jury to decide and not a matter of law subject to judicial determination. Temporal remoteness usually goes to the weight of the evidence, not its admissibility. *State v. Hall*, 85 N.C. App. 447, 451, 355 S.E.2d 250, 253, *disc. rev. denied*, 320 N.C. 515, 358 S.E.2d 525 (1987).

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

We have heretofore allowed the introduction of evidence of crimes interrupted by far more than the twenty-six months present here which militates in favor of the conclusion that the trial court properly submitted the course of conduct circumstance in the instant case. *See, e.g., State v. Faircloth,* 99 N.C. App. 685, 394 S.E.2d 198 (1990) (twenty-eight months does not render evidence impermissibly remote); *State v. Roberson,* 93 N.C. App. 83, 376 S.E.2d 486 (five years does not diminish similarities), *disc. rev. denied,* 324 N.C. 435, 379 S.E.2d 247 (1989); *State v. Hall,* 85 N.C. App. 447, 355 S.E.2d 250 (nine years does not render evidence of prior act inadmissible), *disc. rev. denied,* 320 N.C. 515, 358 S.E.2d 525 (1987).

The record here reveals markedly similar, if not identical, motivations behind the murders of Karen and Teresa Puryear. There was evidence that defendant believed that Teresa, defendant's first victim, had killed defendant's infant son by means of smothering and that defendant avenged this death by killing Teresa. Similarly, there was evidence that defendant was upset at the prospect that Karen, his second murder victim, would obtain legal custody of the couple's two children and that defendant killed Karen in order to prevent her from doing so. Indeed, testimony presented at trial indicated that defendant threatened to shoot Karen if she attempted to retrieve the children. At bottom, defendant's violent behavior toward the Puryear sisters was motivated by an overpowering desire to somehow assert his relationship with his children. Any obstacle that got in his way was violently neutralized. Moreover, the fact that the two murder victims here were sisters weighs more heavily in the balancing than if the two victims were unrelated. It stands to reason that if multiple victims are from the same family, such as here, or another associated group, it is much more likely that there exists some connection between their murders than if the victims were not so associated.

Alternatively, the jury could have inferred course of conduct on the basis of testimony provided by defendant's prison cellmate, Fred Jacobs. Jacobs testified that defendant had informed him that defendant killed the Puryear sisters because he believed that they had gotten the better of him in a cocaine deal. This evidence was before the jury and therefore was an additional basis on which the trial court could have submitted the course of conduct aggravating circumstance.

Additionally, the *modus operandi* was the same in both murders. Both sisters were shot in the back of the head, both were naked at the time of their deaths, and both were wrapped in layers of black and clear plastic and cloth sheets in similar shallow graves located only one and one-half miles from defendant's home. Moreover, extremities of both victims were removed (part of an arm in one case and fingertips in the other), apparently in an effort to prevent subsequent identification of the bodies. Taken together, the obvious similarities in motive and *modus operandi* of the crimes warranted submission of the course of conduct aggravating circumstance to the jury.

[12] Defendant contends, and the State concedes, that the instructions imposed a unanimity requirement for finding mitigating circumstances and were therefore improper under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990); *see also State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990) (opinion after remand).

> In *McKoy* the United States Supreme Court held unconstitutional North Carolina's capital sentencing jury instructions which required the jury to find the existence of a mitigating circumstance unanimously in order for any juror to consider that circumstance when determining the ultimate recommendation as to punishment. The Court reasoned that North Carolina's "unanimity" requirement was constitutionally infirm because it "prevent[ed] the sentencer from considering all mitigating evidence" in violation of the eighth and fourteenth amendments.

*State v. Sanderson*, 327 N.C. 397, 402, 394 S.E.2d 803, 805-06 (1990) (quoting *McKoy v. North Carolina*, 494 U.S. at 435, 108 L. Ed. 2d at 376).

After reviewing the record, we conclude that the trial court gave the unconstitutional *McKoy* instruction. Thus, unless the State demonstrates that the error was harmless beyond a reasonable doubt, defendant must have a new sentencing proceeding. *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 462; N.C.G.S. 15A-1443(b) (1988). The State, in its brief, further concedes that "[t]he record contains nothing to support a harmless error argument" and that, with regard to the *McKoy* error, this case "is indistinguishable from the other cases which have been sent back for resentencing for similar errors." We agree. The trial court submitted five possible mitigating circumstances, and the jury, operating under the unanimity instruction, found only one. There was evidence to support

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

at least some of the circumstances not found. Given this evidence, we conclude that the sentencing proceeding was constitutionally infirm in that we cannot conclude beyond a reasonable doubt that the erroneous instruction did not prevent one or more jurors from finding the mitigating circumstance to exist.

As other alleged errors in the sentencing phase are unlikely to recur at a new capital sentencing proceeding, and because defendant's preservation issues have previously been determined contrary to defendant's contention, we do not address them.

In summary, we find no error in the guilt-innocence phase of defendant's trial. We do, however, find prejudicial *McKoy* error in the capital sentencing proceeding. Thus, we vacate the sentence of death and remand the case to the Superior Court, New Hanover County, for a new capital sentencing proceeding on the first-degree murder conviction.

GUILT-INNOCENCE PHASE: NO ERROR;

SENTENCING PROCEEDING: NEW CAPITAL SENTENCING PROCEEDING.

FRYE, J., dissenting as to sentence.

Defendant argues that his death sentence must be vacated because the trial judge erred by submitting the "course of conduct" aggravating circumstance to the jury. Furthermore, because this was the only aggravating circumstance submitted and found, defendant argues a sentence of life imprisonment must be imposed by this Court. I agree.

The course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), is as follows:

The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

N.C.G.S. § 15A-2000(e)(11). In *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), the first case in which this Court reviewed this aggravating circumstance, we quoted with approval the following jury instruction:

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

> Now, ladies and gentlemen, the murder of Eric Joines by the defendant was part of such a course of conduct if it and other crimes of violence were parts of a pattern of intentional acts directed toward the perpetration of such crimes of violence which establishes that there existed in the mind of the defendant a plan, scheme, or design involving both the murder of Eric Joines and other crimes of violence.

*Id.* at 685, 292 S.E.2d at 261. The pattern jury instruction for this aggravating circumstance is essentially the same, stating that a murder is part of a course of conduct "if it and the other crimes of violence are part of a pattern of the same or similar acts which establish that there existed in the mind of the defendant a plan, scheme, system or design involving both the murder and those other crimes of violence." N.C.P.I.—Crim. 150.10(11) (1990). Judge Herring's instruction to the jury in this case tracked the pattern instruction. Thus, not only must there be additional acts of violence, but the State's evidence must demonstrate that there existed in the mind of the defendant a plan, scheme, system or design involving both the murder and another crime of violence.

Since the *Williams* decision in 1982, we have reviewed at least thirteen cases in which this aggravating circumstance was submitted to the jury, and in *every case except one* the "other crime of violence" occurred contemporaneously with or within hours of the murder for which the defendant was being prosecuted. *E.g.,* *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992) (defendant killed his son, and immediately thereafter assaulted his wife who tried to help her son); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991) (woman immediately kidnapped from car and raped after man with whom she was driving was killed by defendant); *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 330 N.C. 66, 408 S.E.2d 732 (1991) (child killed within hours of her mother's death after she awoke while defendant was disposing of her mother's body); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds*, *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988) (immediately after killing victim, defendant fired gun at another); *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985) (defendant killed sister and father of estranged wife in rapid succession); *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740, *cert. denied*, 464 U.S. 908,

78 L. Ed. 2d 247 (1983) (woman killed and husband beaten within moments of each other); *Williams*, 305 N.C. 656, 292 S.E.2d 243 (service station employee and convenience store employee killed within hours of each other during back-to-back robberies). In all these cases, we found no error in the trial court's submission of the course of conduct aggravating circumstance to the jury.

The one case which does not fit this pattern is *State v. Price*, 326 N.C. 56, 388 S.E.2d 84, *sentence vacated*, --- U.S. ---, 112 L. Ed. 2d 7 (1990). In *Price*, the other crimes of violence, arson and hostage taking, occurred *five days* after the murder for which the defendant was being prosecuted. In order to determine whether these subsequent crimes of violence were part of a course of conduct, we said that it was necessary to consider a "number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi* and motivation by the same reasons." *Id.* at 81, 388 S.E.2d at 98. We concluded that all the crimes of violence were "elements of a five-day rampage," evoking a common *modus operandi* and motivation. *Id.* at 82, 388 S.E.2d at 98. Therefore, based on the proximity in time, five days, and the common *modus operandi* and motivation, we held that it was not improper for the trial judge to submit the course of conduct aggravating circumstance to the jury. *Id.* at 83, 388 S.E.2d at 99.

An overview of our cases reflects this Court's realization that the closer the incidents of violence are connected in time, the more likely that the violent acts are part of a plan, scheme, system or design which existed in the mind of the defendant. Conversely, the further apart the violent acts are temporally, the more unlikely it is that the crimes are somehow related, and the more incumbent it is upon a court to carefully consider other factors, such as *modus operandi* and motivation, in determining whether the acts of violence are part of a course of conduct. Thus, in order to find course of conduct a court must consider the circumstances surrounding the acts of violence and discern some transactional connection, common scheme or psychological thread which ties them together. *See e.g., Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (defendant immediately shoots at his intended victim after killing wrong person by mistake); *Noland*, 312 N.C. 1, 320 S.E.2d 642 (defendant, angry at his estranged wife, kills his father-in-law and sister-in-law in rapid succession); *Williams*, 305 N.C. 656, 292 S.E.2d 243 (defendant kills two clerks during armed robbery spree).

The State asks this Court to reject the approach we have followed since *Williams* and find that *neither* a common scheme nor plan *nor* temporal proximity is required for the course of conduct aggravating circumstance. All that needs to be shown, argues the State, is a "pattern or course of violence overtime." To support its position, the State cites *State v. Avery*, 315 N.C. 1, 337 S.E.2d 786 (1985), a *noncapital* case involving a *nonstatutory* aggravating factor. In *Avery*, we approved the trial judge's finding of a nonstatutory aggravator that defendant engaged in a pattern or course of violent conduct which included the commission of other crimes of violence against other persons. *Id.* at 35-36, 137 S.E.2d at 805-06. We said that, in addition to the violent conduct for which the defendant was on trial, "there was evidence that prior to that date defendant had hit several members of his family during attacks of rage, shot a gun while angry at one of his neighbors, hit his boss at another company where he once worked, and was involved in two fist fights." *Id.* at 35, 337 S.E.2d at 806. We did not set out a time frame for these other acts of violence.

The precise issue in *Avery* was not whether it was appropriate for the trial judge to find this factor based on the evidence before him; instead, the issue was whether the trial court ran afoul of N.C.G.S. § 15A-1340.4(a)(1) by basing two aggravating factors upon the same evidence. The defendant argued that the course of violent conduct factor and another factor—that the defendant was a dangerous and mentally abnormal person—were both predicated upon the fact that the defendant suffered from a mental illness at the time he committed the crimes for which he was convicted. *Id.* at 34, 337 S.E.2d at 805. We held that the two factors were based on different evidence, citing the defendant's other acts of violence to support the course of violent conduct factor. Thus, our attention in *Avery* was not squarely focused on the exact issue before us today. Furthermore, in *Avery*, we were dealing with a *nonstatutory* aggravating factor under the *Fair Sentencing Act* which the trial judge found on the particular facts of the case before him. Our capital cases interpreting N.C.G.S. § 15A-2000(e)(11) were neither considered nor relied upon in reaching our decision on this issue in *Avery*. I therefore believe *Avery* should be restricted to its own facts, and that we should reject the State's invitation to alter the way we have been analyzing death cases under N.C.G.S. § 15A-2000(e)(11) for the past decade.

## STATE v. CUMMINGS

[332 N.C. 487 (1992)]

After a careful review of the record in this case, I find only one of three factors discussed in *Price* to be present. Furthermore, there is no credible evidence that the two murders were part of a connected series of circumstances; there appears no transactional connection between them. Karen's murder, the "other crime of violence" which the trial judge found to be part of a course of conduct, occurred *twenty-six months* after Teresa's murder, the crime for which defendant was convicted. During this period of more than two years, there was no pattern of violence by defendant, such as the "five-day rampage" in *Price. See Price*, 326 N.C. at 82, 388 S.E.2d at 98. While defendant's *modus operandi* was the same in both murders, I agree with defendant's appellate attorney that there is no credible evidence to suggest that at the time defendant killed Teresa, he had in mind a plan, scheme, or design which involved the death of Karen more than two years later.[1] Even the prosecutor did not suggest that defendant's motivations for the two murders were the same. During her closing argument, prosecutor Powell suggested to jurors that defendant killed Teresa out of anger for the death of his son Clifford; she suggested that defendant killed Karen out of concern that she would take custody of their children and out of anger for Karen having sworn out a nonsupport warrant against him.

The ugly reality is this defendant brutally murdered two sisters two years apart for reasons we may never know. As much as we deplore his actions, the State has not demonstrated that these acts of violence were tied together in such a way as to permit the trial judge to submit the course of conduct aggravating circumstance for the jury's consideration. I would therefore hold that the trial judge erred by allowing the jury to consider N.C.G.S. § 15A-2000(e)(11) in aggravation of the murder for which defendant was convicted.

---

1. Although former prison inmate Fred Jacobs testified that he was told by defendant that defendant killed the sisters because they "had ripped him off on a cocaine deal," the prosecution did not actively pursue that theory. During her closing argument to the jury, prosecutor Powell did not even mention Jacobs' testimony concerning the alleged drug deal. Furthermore, the State on appeal does not argue that the sisters were killed because of a drug deal gone bad. Finally, had the drug deal been the motivation behind both murders, why were they committed twenty-six months apart? Common sense dictates that both murders would have been committed around the same time had they both been motivated by anger over the same botched drug deal.

My conclusion that the course of conduct circumstance was erroneously submitted to the jury finds support in Judge Farmer's decision in *Cummings I* to sever defendant's trials for the murders of Karen and Teresa. Judge Farmer ruled that, because of the two-year span between the murders, the "transactional connection" between the two murders was not sufficient to allow the cases to be tried together. *Cummings I*, 326 N.C. at 310, 389 S.E.2d at 73.

Finally, given the majority opinion, I feel compelled to emphasize the well-settled maxim of capital punishment jurisprudence that aggravating circumstances must be narrowly construed to limit discretion " 'so as to minimize the risk of wholly arbitrary and capricious action.' " *See Zant v. Stephens*, 462 U.S. 862, 874, 77 L.Ed. 2d 235, 248 (1983) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 49 L.Ed. 2d 859, 883 (1976) (opinion of Stewart, Powell and Stevens, JJ.); *see also State v. Oliver*, 302 N.C. 28, 61, 274 S.E.2d 183, 204 (1981) ("Where it is doubtful whether a particular aggravating circumstance should be submitted, the doubt should be resolved in favor of defendant."); *State v. Goodman*, 298 N.C. 1, 30, 257 S.E.2d 569, 588 (1979) (when considering the submission of aggravating circumstances, "[w]e believe that error in cases in which a person's life is at stake, if there be any, should be made in the defendant's favor"). Thus, even assuming this to be a "close call," we must interpret our death penalty statute narrowly to stay within the boundaries of the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution.

Because this was the only aggravating circumstance found by the jury, defendant's death sentence must be vacated and a sentence of life imprisonment imposed. N.C.G.S. § 15A-2000(d)(2) (1988) (Supreme Court *shall* vacate death sentence and impose life sentence "upon a finding that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death"); *see State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991); *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984); *State v. Beal*, 311 N.C. 555, 319 S.E.2d 557 (1984).

Although not argued by counsel for either side, I feel compelled to address an apparent conflict in our cases dealing with the proper resolution of situations such as this in which the *sole* aggravating circumstance found by the jury is subsequently found by this Court

STATE v. CUMMINGS

[332 N.C. 487 (1992)]

to have been improperly submitted.[2] As noted above, we have held on at least three occasions that N.C.G.S. § 15A-2000(d)(2) requires this Court to impose a sentence of life imprisonment in lieu of the death penalty when we determine that the sole aggravating circumstance found by the juror was improperly submitted by the trial court. *McDowell*, 329 N.C. at 390, 407 S.E.2d at 215; *Hamlet*, 312 N.C. at 162, 321 S.E.2d at 847; *Beal*, 311 N.C. at 566, 319 S.E.2d at 563. These cases are in contrast to *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981), where we remanded for a new sentencing proceeding after concluding that the sole aggravating circumstance had been improperly submitted. *Id.* at 271, 275 S.E.2d at 483.

In *Silhan*, our analysis centered on the double jeopardy implications of remanding for a new sentencing proceeding after finding that the sole aggravating circumstance had been improperly submitted. *Id.* at 266-70, 275 S.E.2d at 480-83. We concluded that double jeopardy considerations would not preclude a new sentencing proceeding and that this Court should remand "if there are aggravating circumstances which would not be constitutionally or legally proscribed at the new hearing." *Id.* at 270, 275 S.E.2d at 482. We then held that an aggravating circumstance would not be so proscribed at the new hearing if "(1) there was evidence to support it at the hearing appealed from; and (2) it was not submitted to the jury [during the first hearing] or, if submitted, the jury found it to have existed; and (3) there is no other legal impediment (such as the felony murder merger rule) to its use." *Id.* at 270-71, 275 S.E.2d at 482-83. In contrast to our later cases, however, we did not in *Silhan* consider the effect of N.C.G.S. § 15A-2000(d)(2) in our analysis. *See also, State v. Stanley*, 310 N.C. 332, 346, 312 S.E.2d 393, 401 (1984) (although citing N.C.G.S. § 15A-2000(d)(2), we also cited *Silhan* and held that a sentence of life imprisonment must be imposed only because "there is no evidence in the case to support any aggravating circumstance").

I conclude that, notwithstanding the double jeopardy analysis in *Silhan*, N.C.G.S. § 15A-2000(d)(2) requires this Court to impose

---

2. The same situation would be presented were we to find that both of two aggravating circumstances or all of three or more aggravating circumstances presented to the jury had been improperly submitted. Stated differently, where every aggravating circumstance found by the jury is subsequently found by this Court to have been improperly submitted, N.C.G.S. § 15A-2000(d)(2) requires that a sentence of life imprisonment be imposed in lieu of the death penalty.

a sentence of life imprisonment in lieu of the death penalty in any case in which the sole aggravating circumstance found by the jury is subsequently found by this Court to have been improperly submitted. As noted in footnote two, the same result would follow when the jury finds two or more aggravating circumstances and this Court finds that the trial court erred in submitting each and every one.[3]

In conclusion, I agree with the majority in finding no error in defendant's conviction for first-degree murder and in concluding that defendant's death sentence must be vacated due to *McKoy* error. However, I disagree with the majority's conclusion that the § 15A-2000(e)(11) "course of conduct" aggravating circumstance was properly submitted to the jury. I conclude that this aggravating circumstance was improperly submitted to the jury and, since this was the sole aggravating circumstance found by the jury, N.C.G.S. § 15A-2000(d)(2) requires this Court to vacate the death sentence and sentence defendant to imprisonment in the State's prison for the remainder of his natural life. That is my vote.

Chief Justice Exum joins in this dissenting opinion.

_____

3. Thus, N.C.G.S. § 15A-2000(d)(2) would *not* require this Court to impose a life sentence in lieu of the death penalty where, for example, two aggravating circumstances are found by the jury, and this Court finds that only one was improperly submitted.